## STATE OF CONNECTICUT *v.* JAMES CLARK

HOUSE, C. J., COTTER, LOISELLE, BOGDANSKI and LONGO, Js.

Argued October 10, 1975—decision released March 2, 1976

*Gerald E. Farrell,* special public defender, for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

COTTER, J. James Clark was indicted by a grand jury for murder in the first degree. He was convicted, after a trial to a jury, of murder in the second degree in the fatal shooting of William Streater, who died on February 8, 1970, under what was then § 53-9 of the General Statutes. He was sentenced by the court to life imprisonment and has appealed from the judgment rendered.

The defendant, in his appeal, has claimed error in the charge, in the restriction of the defendant's cross-examination of a state's witness, in the denial of his motion for permission to file a motion to set aside the verdict and lastly, in view of all the claimed errors, in that there was inadequate representation of counsel within the meaning of the sixth and fourteenth amendments to the United States constitution and article first, section 8, of the Connecticut constitution.

## I

To assess these claims we have reviewed the entire trial transcript. The state called three of the victim's companions on the night he was shot. The testimony disclosed the following:

### A. The Passengers' Testimony

At approximately 1 a.m. on February 8, 1970, William Streater was among a group of people who were returning from a party on Franklin Street in New Haven. They were proceeding along West Street in two cars, and as they neared the intersection of Columbus Avenue, two men were seen standing in the street. Lefty Streater, who was a passenger in the first car and William Streater's cousin, shouted at them, apparently telling them to move, and one of the two shouted back at him. When the first car stopped at the intersection, Lefty and William Streater, the deceased, jumped out and started arguing with the two men.

At this point, accounts varied as to exactly what happened next. Denise Williams, who was a passenger in the first car, testified that William Streater's two brothers, David and Kenneth Streater, along with another passenger jumped out in an attempt to stop the argument. They grabbed William Streater and started to pull him away, as one of the two men seized him and said something to him. As he was being pulled back to the car, Miss Williams said that she saw the "short man standing next to this tall man, and the little short man passed this tall man a gun." The victim's friends succeeded in getting him back in the first car, but he was able to slide out on the other side, and he headed back towards the two men. At this

point, Miss Williams said, it seemed that things had calmed down. William Streater told the two men "I don't want to fight you," and his brothers urged him to "come on." As the deceased began walking back towards the car, "All of a sudden the man shot him. He grabbed his chest, ran across the street and fell down." Miss Williams' testimony was corroborated by David and Kenneth Streater, albeit with some minor discrepancies.[1]

The witnesses' in-court identification of the defendant was qualified. Denise Williams said she had "definitely never seen him before,"[2] while David Streater said he was "not positive" that the defendant was the person who had killed his brother, though he added that he had seen him once in a police lineup.

By contrast, Kenneth Streater testified positively that the defendant was the person who had shot his brother. He admitted on cross-examination that he had been uncertain of the assailant's identity for several months after the shooting, but added that he was "absolutely positive" of it after seeing the defendant in police photographs and a lineup.

## B.  Ecclesiastes Barnes' Testimony

The only other eyewitness account was provided by Ecclesiastes Barnes, the defendant's uncle, whose

---

[1] Both brothers testified that the shorter man did not hand the gun to the taller man, but rather that the two "tussled" for the gun before the taller one seized it and shot the victim. Also, Kenneth stated that it was Lefty Streater, not the deceased, whom his group had sought to put back in the car, but added that they were trying to keep the deceased out of the argument as well.

[2] Miss Williams did state that she noticed facial resemblances between some men she had seen in a lineup and photographs of the person who shot the victim, but the transcript does not disclose whether the defendant ever appeared in a lineup or police photographs viewed by Miss Williams.

testimony generally corroborated that of the three passengers, and who admitted having passed the defendant the gun with which the victim was shot. Barnes explained that he and the defendant had been drinking at a club in New Haven earlier that evening and had been walking towards another bar at the intersection of West Street and Columbus Avenue when the victim was approached by a man who "told James that he wanted to straighten out some little incident that happened a couple of nights before." Barnes said that this man started punching the defendant, and that four or five others joined in, one of whom said, "I'm going to kill him. That's my brother," at which point Barnes passed the defendant the gun because he did not think he could win the fight. It was then that the defendant shot the deceased.

The cross-examination of Barnes is a focal point of the defendant's claims on appeal, particularly regarding the effectiveness of his counsel. Barnes denied that he had been pressured into giving the police a statement which incriminated the defendant, although he admitted that he had first told them that he and the defendant arrived on the scene after the shooting. He also denied that he was testifying for the state in return for leniency. The court sustained objections to questions as to whether Barnes was familiar with Connecticut's accomplice statute and to a line of inquiry which sought to establish why Barnes had been incarcerated prior to trial pertaining to a breach of the peace charge.[3]

---

[3] A reading of these questions, in conjunction with the evidence presented by the defense; infra Part I-C; reveals that trial counsel was seeking to establish that Barnes had been coerced by the police into changing his story and inculpating the defendant by tactics such as keeping him at the police station for 24 hours and arresting

## C.  The Defendant's Case-in-chief

The defense sought to establish that the defendant and Barnes had arrived at the intersection after the shooting and that Barnes had changed his story to implicate the defendant only after he was beaten by the police and kept at the station against his will.

The defendant took the stand and testified that he and his uncle stopped at the intersection when they saw a crowd had gathered and after they were told by one of the passengers that someone had been shot.  He added that they waited until after the police arrived and that Barnes then drove him home.  He denied all of the charges made against him by the state's witnesses.  To corroborate this story, the defendant's wife and mother testified that the defendant had spontaneously told them about seeing the deceased lying in the street.

Aramieta Williams, who was the defendant's mother and Barnes' sister, also stated that Barnes had been visited by the police at his home the month after the shooting and that he told them he and the defendant had arrived after they saw the crowd had gathered.  He was asked to come to the police station to give a formal statement, and there he changed his story and gave the incriminating evidence which he repeated at trial.  When Mrs. Williams asked him why he "didn't stick to" the exculpatory story, she said that he told her how he had been beaten, kept against his will and told that the only way he could help his nephew was by

---

him for breach of the peace when he attempted to leave.  The transcript does not show that the breach of the peace charge was connected in any way with Barnes' involvement in this case.

saying his nephew had shot the deceased. Hezekiah Barnes, who was Ecclesiastes Barnes' brother, and Rev. Curtis Mouning both testified that Barnes had told them the same thing.

The state, on rebuttal, presented evidence from a police officer who had visited Barnes at his home the month after the shooting, and the officer stated that while at his house Barnes denied being involved in the shooting, but that once they got outside to go towards the station he admitted that the defendant had shot the deceased, explaining that he had been reluctant to admit that in front of his family.

On cross-examination of Mrs. Williams, she stated that Barnes had been released from a mental hospital not long before the shooting. Even though this was the only reference the jury heard about Barnes' hospitalization, they sought to ask questions about this fact during their deliberations, a request refused by the court. Trial counsel attempted, out of the presence of the jury, to introduce by stipulation a statement given him by Ecclesiastes Barnes' wife, who was recuperating from an operation and thus unable to testify, to the effect that Barnes had "only recently returned from Newtown State Hospital, where he was treated for a nervous condition, and was still on medication." An objection by the state to the admission of this stipulation was sustained.

The jury returned a verdict on February 1, 1971, of guilty of murder in the second degree, which the court accepted. A motion to set aside the verdict however, was not filed until December 5, 1972, although it must be filed within 24 hours after the court accepts a verdict. Practice Book § 254. A sub-

sequent motion for permission to file such a motion was denied by the trial court. The court's ruling as well as the late filing are both claimed as error.

## II

Identification of the deceased's assailant was a fundamental issue in this case. Two of the three passengers called by the state were unable to make an in-court identification of the defendant.[4] Consequently, the state's case rested largely on testimony of Kenneth Streater, who made a positive in-court identification of the defendant, but admitted to having doubts as to identity the first few months after the killing, and Ecclesiastes Barnes, who admitted passing the defendant the murder weapon but who had apparently been treated for a nervous condition not long before the shooting.

The defendant claims that he was denied adequate assistance of counsel largely because trial counsel (1) failed to conduct a proper pretrial factual investigation, especially on the identification points,[5] and (2) failed to pursue the subject of Barnes' mental treatment. The defendant also cites counsel's failure to request cautionary instruction as to an accomplice after Barnes' testimony and the late filing of the motion to set aside the verdict.

The charge that an attorney has rendered inadequate representation is a serious one indeed and is not to be made lightly. *State* v. *Chesney,* 166 Conn. 630, 639, 353 A.2d 783; *State* v. *Clements,* 166

---

[4] The state offered evidence that Lefty Streater was stationed in Germany in the United States Army at the time of trial and was thus unavailable to testify.

[5] The record discloses only a pretrial motion, which sought to suppress an out-of-court identification by David Streater. That motion was withdrawn at trial; however, David Streater could not identify the defendant as his brother's assailant.

Conn. 96, 97, 347 A.2d 80. Even though courts may be willing to order a new trial upon a showing of prosecutorial omission,[6] it will require a very strong showing of omissions by defense counsel to justify overturning a conviction. See, e.g., *United States* v. *Clayborne,* 509 F.2d 473, 479 (D.C. Cir.).

The proper standard to be used in determining whether representation is constitutionally adequate has been in ferment in recent years. Connecticut, along with other jurisdictions, for many years applied the test of whether the representation of counsel was "so woefully inadequate as to make the trial a farce and a mockery of justice." *Gentry* v. *Warden,* 167 Conn. 639, 645, 356 A.2d 902, citing *Palmer* v. *Adams,* 162 Conn. 316, 321, 294 A.2d 297, which contains an excellent discussion by *Thim, J.,* setting forth in detail the history, tests, standards and application of the requirements pertinent to the principle of adequate representation of counsel guaranteed under the federal and state constitutions. See also *State* v. *Ralls,* 167 Conn. 408, 432, 356 A.2d 147; *State* v. *Costello,* 160 Conn. 37, 40, 273 A.2d 687; *United States ex rel. Boucher* v. *Reincke,* 341 F.2d 977, 982 (2d Cir.); 21 Am. Jur. 2d, Criminal Law, § 315; annot., 74 A.L.R.2d 1403 § 4 (b).

In the wake of *Gideon* v. *Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799, which guaranteed assistance of counsel to state criminal defendants under the sixth as well as the fourteenth amendments, the trend has been towards judging the

---

[6] See, e.g., *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215; *Giles* v. *Maryland,* 386 U.S. 66, 100, 87 S. Ct. 793, 17 L. Ed. 2d 737 (concurring opinion of *Fortas, J.*).

assistance of counsel under the more stringent standards of the sixth amendment; *United States v. DeCoster,* 487 F.2d 1197, 1202 (D.C. Cir.) ; reasoning that the fundamental right to counsel would be a hollow right indeed if it did not encompass the right to have the effective assistance of counsel. See *McMann v. Richardson,* 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763;[7] see also Waltz, "Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases," 59 Nw. U.L. Rev. 289, 292; note, "Effective Assistance of Counsel for the Indigent Defendant," 78 Harv. L. Rev. 1434.

Thus, the "farce and mockery" standard, which is more helpful as a vivid description of the burden the defendant must sustain than as a literal guideline with clearly articulable criteria,[8] has been criticized and abandoned in a growing number of federal appellate courts[9] as well as state courts.[10] In its

---

[7] See *Reece* v. *Georgia,* 350 U.S. 85, 90, 76 S. Ct. 167, 100 L. Ed. 77; *Glasser* v. *United States,* 315 U.S. 60, 69–70, 62 S. Ct. 457, 86 L. Ed. 680; *Avery* v. *Alabama,* 308 U.S. 444, 446, 60 S. Ct. 321, 84 L. Ed. 377; *Powell* v. *Alabama,* 287 U.S. 45, 57, 53 S. Ct. 55, 77 L. Ed. 158.

[8] See *Bruce* v. *United States,* 379 F.2d 113, 116 (D.C. Cir.) ; *United States* v. *Hager,* 505 F.2d 737 (8th Cir.).

[9] *Moore* v. *United States,* 432 F.2d 730 (3d Cir.) (en banc); *Coles* v. *Peyton,* 389 F.2d 224 (4th Cir.), cert. denied, 393 U.S. 849, 89 S. Ct. 80, 21 L. Ed. 2d 120; *Herring* v. *Estelle,* 491 F.2d 125 (5th Cir.) ; *Beasley* v. *United States,* 491 F.2d 687 (6th Cir.) ; *United States* v. *DeCoster,* 487 F.2d 1197 (D.C. Cir.) ; but cf. *Moran* v. *Hogan,* 494 F.2d 1220 (1st Cir.) ; *United States* v. *Yanishefsky,* 500 F.2d 1327, 1333 n.2 (2d Cir.) ; *United States* v. *Garguilo,* 324 F.2d 795 (2d Cir.) ; *Thomas* v. *Pate,* 493 F.2d 151, 157 n.4 (7th Cir.), cert. denied, 419 U.S. 879, 95 S. Ct. 143, 42 L. Ed. 2d 119; *McQueen* v. *Swenson,* 498 F.2d 207 (8th Cir.) ; *United States* v. *Steed,* 465 F.2d 1310 (9th Cir.), cert. denied, 409 U.S. 1078, 93 S. Ct. 697, 34 L. Ed. 2d 667; *Johnson* v. *United States,* 380 F.2d 810 (10th Cir.).

[10] *Risher* v. *State,* 523 P.2d 421, 424 (Alas.) ; *State* v. *Merchant,*

stead has sprung up a variety of new formulations, for example, "reasonably effective assistance";[11] "no reasonably qualified attorney would have so acted";[12] "within the range of competence demanded of attorneys in criminal cases";[13] or "reasonably competent assistance of an attorney acting as his [the defendant's] diligent conscientious advocate" with the level of "reasonably competent assistance" measured by the guidelines in the American Bar Association Standards for the Defense Function, prepared by the ABA Project on Standards for Criminal Justice (Approved Draft 1971).[14] See also Finer, "Ineffective Assistance of Counsel," 58 Cornell L. Rev. 1077, 1079. We recognized the trend recently in *Gentry* v. *Warden,* supra, 646, where counsel's conduct was examined not only under the "farce and mockery" standard but also under a standard that "defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. The defendant's burden is to show that his counsel's conduct fell below that standard and that the lack of competency contributed to the conviction."

10 Md. App. 545, 271 A.2d 752; *Delle Chiaie* v. *Commonwealth,* Mass. , 327 N.E.2d 696; *People* v. *Lewis,* 64 Mich. App. 175, 235 N.W.2d 100; *Thomas* v. *State,* 516 S.W.2d 761, 765 (Mo. App.); *Rook* v. *Cupp,* 526 P.2d 605 (Ore. App.); *Commonwealth* v. *Nole,* 461 Pa. 314, 336 A.2d 302; *Baxter* v. *Rose,* 523 S.W.2d 930, 936 (Tenn.); *Ex parte Gallegos,* 511 S.W.2d 510, 512–13 (Tex. Crim. App.); *In re Cronin,* 133 Vt. 234, 336 A.2d 164; *State* v. *Thomas,* W. Va. , 203 S.E.2d 445; *State* v. *Harper,* 57 Wis. 2d 543, 552, 205 N.W.2d 1.

[11] See, e.g., *Beasley* v. *United States,* supra, 696; *Ex parte Gallegos,* supra; *In re Cronin,* supra.

[12] *State* v. *Thomas,* supra.

[13] *Baxter* v. *Rose,* supra.

[14] *United States* v. *DeCoster,* supra, 1202; cf. *Gentry* v. *Warden,* supra, 646 n.2.

## III

Under this latter standard, which we adopt, we focus specifically on two main areas of concern: counsel's pretrial preparation and cross-examination of Ecclesiastes Barnes.

### A. Counsel's Pretrial Investigation

Constitutionally adequate assistance of counsel contemplates competent representation in all respects.

In the instant case, a primary area requiring competent representation was the identification of the defendant by the deceased's companions. Unquestionably, there is a need for trial counsel to conduct an adequate investigation of the circumstances of pretrial identification; *Moore* v. *United States,* 432 F.2d 730 (3d Cir.); especially when, as here, positive identification was provided by only two of the four prosecution witnesses. As pointed out, supra, Part I-A, Kenneth Streater was the only one of the victim's companions who was definite that the defendant had shot his brother. Defense counsel attempted to impeach him on cross-examination through admissions that he had been uncertain in the past as to the defendant's identity, eliciting specifically that he had stated this publicly at the coroner's hearing. Defense counsel also introduced a police officer who conducted a lineup prior to the defendant's arrest at which Kenneth Streater had identified another party as the assailant. From the thorough and searching cross-examination of this witness, as well as defense counsel's attempted impeachment of Kenneth Streater as provided by a police officer's testimony, we cannot say on this record that the defendant has

sustained his burden of proving that trial counsel's performance fell below that of attorneys of reasonable competence and contributed to the defendant's conviction. Kenneth Streater was adamant in his identification of the defendant and, while admitting to uncertainty in the past, reiterated that he had been positive of the identity after seeing a police photograph and lineup. In *Moore* v. *United States,* supra, 738–39, defense counsel knew in advance that several government witnesses had been unable to identify his client in a police lineup but he failed to cross-examine them at all on this important point, and the Third Circuit reversed for an evidentiary hearing on this issue, inter alia. In the instant case, by contrast, no such hearing is necessary inasmuch as counsel appears to have satisfied his duty with respect to investigating, cross-examining and attempting to impeach an adamant prosecution witness.

## B. Cross-examination of Ecclesiastes Barnes

The testimony of Ecclesiastes Barnes provided the most coherent account of the incidents on the night in question, including the admission that he passed the gun to his nephew and saw him fatally shoot the deceased. Trial counsel's cross-examination was thorough, and sought to elicit from Barnes that he was testifying under police pressure and that in fact he and the defendant had arrived at the intersection after the shooting. Barnes consistently denied that version of events.

During the defense case-in-chief, counsel produced Aramicta Williams, who was Barnes' sister and the defendant's mother, who contradicted Barnes' testimony. Additionally, on cross-examination by the state, she added that Barnes

"hadn't been too long, out of the mental hospital at that time," where, according to a statement from Barnes' wife, he had been treated for a nervous condition. The jury, which had heard Mrs. Williams but not the statement from Mrs. Barnes, sought to ask questions on this subject during their deliberations. The defendant claims that counsel's failure to pursue the subject of Barnes' mental condition deprived him of effective representation. On the facts of this case, we cannot agree.

Failure to cross-examine an adverse witness such as Barnes has generally not been held to constitute inadequate assistance; *United States* v. *Clayborne*, 509 F.2d 473, 477 (D.C. Cir.); *Frand* v. *United States*, 301 F.2d 102 (10th Cir.); inasmuch as the decision whether to cross-examine a witness is almost always a purely tactical one. "This court does not sit to second guess strategic and tactical choices made by trial counsel." *United States* v. *DeCoster*, supra, 1201; see also *State* v. *Costello*, supra, 40; *United States ex rel. Machado* v. *Wilkins*, 351 F.2d 892 (2d Cir.), cert. denied, 383 U.S. 916, 86 S. Ct. 908, 15 L. Ed. 2d 670, reh. denied, 383 U.S. 963, 86 S. Ct. 1228, 16 L. Ed. 2d 306; *Commonwealth* v. *Maroney*, 427 Pa. 599, 610, 235 A.2d 349. Of course, to insulate counsel's failure to cross-examine adverse witnesses from judicial scrutiny on the ground that he made a tactical choice assumes that counsel made his decision on an informed basis. There are, of course, instances in which able counsel have adequately prepared their case yet employed unorthodox methods which may at first glance seem incompetent but are in fact sound tactical decisions under the circumstances of a particular case. If it appears that the failure of trial counsel was the result of inadequate prep-

aration or ineptitude, courts have not been hesitant to reverse or remand the case for an evidentiary hearing to complete the record relevant to the adequacy of trial counsel's representation. This is so where the record on a direct appeal, especially the trial transcript, is insufficient for an appellate court in considering claims of adequate assistance of counsel. See e.g., *United States* v. *DeCoster* supra; *Moore* v. *United States,* supra.

Since the transcript in this case clearly shows that counsel knew of Barnes' treatment before he testified, we are left to determine whether the tactical decision not to pursue this subject was "within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." *Gentry* v. *Warden,* supra, 646. We conclude that it was. The only reference to treatment which the jury heard was a single remark by Mrs. Williams. Strategically, had counsel sought to pursue this subject at length, the effect on the jury of Mrs. Williams' statement might have been totally nullified. The jury did not know of the stipulation from Barnes' wife that his treatment was for a nervous condition, and extensive cross-examination of Barnes on this point might have opened the door to effective rebuttal by the state as well as denials of incompetence by Barnes, who doggedly kept to his incriminating version of events throughout his testimony. From a tactical standpoint counsel's raising merely a hint of mental instability may have been far more effective than seeking to prove Barnes' exact condition head-on by lengthy cross-examination and other proof. "[C]ross-examination is a sharp two-edged sword and more criminal cases are won by not cross-examining adverse witnesses, or by a very selective and limited cross-examination

of such witnesses, than are ever won by demolishing a witness on cross-examination. . . . The decision whether to cross-examine a witness is peculiarily one for defense counsel and his judgment should be entitled to great respect by the court." *United States* v. *Clayborne,* supra, 479; see *State* v. *DeGennaro,* 147 Conn. 296, 304, 160 A.2d 480, cert. denied, 364 U.S. 873, 81 S. Ct. 116, 5 L. Ed. 2d 95. In this case, "counsel could have permissibly concluded as a trial tactic and in light of trial realities that any attack upon credibility would have little impact" or reasonable prospect of weakening Barnes' testimony. *Commonwealth* v. *Maroney,* supra, 610.

We cannot conclude that trial counsel rendered constitutionally inadequate representation in view of the facts among others that he was aware of Barnes' hospitalization, that Barnes' testimony was substantially corroborated by the decedent's companions, and that Kenneth Streater positively identified the defendant. Absence of any one of these facts might have brought about a different result.[15]

There is no error.

In this opinion the other judges concurred.

---

[15] We have examined and find no merit in three other assignments of error made by the defendant.