BENJAMIN F. MILLER, JR. *v.* COLIN C. J. ANGLIKER,
M.D., DIRECTOR, WHITING FORENSIC INSTITUTE
(2704)

DUPONT, C.P.J., HULL and BORDEN, Js.

Argued April 2—decision released July 2, 1985

*John R. Williams,* for the appellant (plaintiff).

*Frederick W. Fawcett,* assistant state's attorney,
with whom, on the brief, was *Donald A. Browne,* state's
attorney, for the appellee (state).

HULL, J. This is an appeal from the denial of
Benjamin Miller, Jr.'s petition for a writ of habeas
corpus which, if granted, would have released him from

confinement at the Whiting Forensic Institute. We conclude that the trial court's denial of that petition was proper.

The court's meticulous and comprehensive findings of fact need only be summarized here. On March 17, 1972, Benjamin Miller, Jr., was arrested after an investigation of nearly five years duration into the murders of five black prostitutes. All were found strangled in a wooded area off of the Merritt Parkway, near River Bank Road in Stamford. The first victim, Rosell Rush, was found on August 4, 1967. Thereafter, the bodies of Donna Roberts, Gloria Kahn, Gail Thompson and Alma Henry were found on May 3, 1968, September 8, 1968, July 10, 1971, and August 22, 1971, respectively.

There was a substantial amount of publicity about the murders in the Stamford area. The black community, as well as other groups, expressed anger over the lack of progress in the police investigation. For that reason, a special team of state police officers and a Stamford police detective was created to investigate the murders full time.

After a Reverend James Miller received an anonymous telephone call describing the location of one of the bodies and expressing the desire that the victim receive a Christian burial, the police made a check of other Reverend Millers in the Stamford area. As a result of that check, the name of the plaintiff, who claimed to be an ordained clergyman, was placed on a file card. After three more bodies were found, Miller was invited to an interview. He wrote a letter to the police saying that he could not come.

Nothing further was done to investigate Miller until January, 1972, when the card and Miller's failure to come in were discovered by the detective assigned to the investigation. At that point, a background investigation of the plaintiff was initiated. It was determined

that Miller was a white employee at the Darien post office who walked past the home of Reverend James Miller every day during lunch. The plaintiff also spent a great deal of time preaching to the black community in Stamford, particularly to the women of the community. Miller also had a history of mental illness, having, at one time, been hospitalized at Fairfield Hills State Hospital. Police visited Fairfield Hills and were given access to Miller's files without his prior approval.

The police then expanded their investigation of Miller, interviewing his wife and acquaintances. They found that Miller had marital problems. He had beaten and threatened to kill his wife. Finally, they interviewed the plaintiff at his home, beginning with a reading of his *Miranda*[1] rights. This interview was not productive, however, because the plaintiff appeared to be somewhat incoherent.

Between January 26, 1972, and February 16, 1972, Miller was interviewed by the police four more times. These interviews were lengthy sessions, each of which began with a reading of Miller's *Miranda* rights. Miller was described as a compulsive talker who forced the police officers to work in shifts. During one of the interviews Miller offered to take a polygraph test, which was administered on the next occasion upon which he spoke to police. The test was inconclusive due to Miller's erratic emotional changes.

During these interviews, Miller made several incriminating statements to police officers. He stated that he had learned of Gail Thompson's murder some six weeks later. This was directly contradicted by the statement of the victim's mother, who said that Miller had visited the family home "a couple of days" after the body was found to express his condolences. Miller

---

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

also admitted to having had sexual relations with Gail Thompson in his car in North Stamford, and when he was shown a photograph of her body, he correctly identified the item around her neck as a handkerchief although the publicized version of the killings suggested that all of the victims had been strangled with bras. Further, when Miller was shown a photograph of the body of Alma Henry, he correctly identified adhesive tape as the substance wrapped around her head, stating "I don't use tape that narrow." From the photograph it was almost impossible to identify what was wrapped around her head, and the fact that tape had been used was not publicly known.

On February 16, 1972, police suggested to Miller that he should consult Robert Miller, a psychiatrist at Fairfield Hills. He declined to see Robert Miller, preferring to see Shirley Williams, a psychiatrist at the Norwalk Hospital, instead. After speaking with Williams, Benjamin Miller was seen by Michael Moadel, another psychiatrist, who signed an order for Miller's temporary involuntary commitment to Fairfield Hills. Miller was immediately taken to Fairfield Hills and was admitted.

In early January, 1972, State Police Detective Robert Geoghan and Stamford Police Detective George Mayer had visited Fairfield Hills where they discussed Miller's background with Robert Miller, who was considered to be "somewhat of a forensic psychiatrist." He agreed that if the plaintiff could be admitted to Fairfield Hills, it would provide an excellent opportunity to conduct interviews of the plaintiff.

Throughout his confinement, there has been substantial agreement that Benjamin Miller suffers chronic schizophrenia. There was also evidence in his hospital records that he had been placed on suicide watch occasionally, that he was delusional and that "religosity [sic]

is in evidence." Miller regularly received medication in the form of trilafon and, at some point, he was also given sinequan.

Miller was interviewed on several occasions by Robert Miller, by the investigating officers or by all of them. Robert Miller indicated to the officers that he believed that the plaintiff was, in fact, the killer of the women, although at no time did he obtain a confession. These interviews culminated, on February 29, 1972, in Benjamin Miller's handwriting a confession to the murders of seven women. At another point, he wrote that he had killed Gail Thompson, Alma Henry, Sissy Rush and others he could not remember. The plaintiff led the conversation during which these confessions were made and his statements about the Gail Thompson murder corresponded to the physical findings at the scene.

On March 1, 1972, Miller signed both a handwritten statement and a typed duplicate admitting to and detailing the murder of Alma Henry. He also signed a statement indicating that he had returned, with police, to the murder scene where he pointed out the spot where the murder had occurred, and stating that he had tied her hands, taped her mouth and whipped her body with tree branches while he was killing her. These facts were not publicly known. In this statement, Miller also admitted that before Alma Henry died, but while she was unconscious, he had committed the act of cunnilingus upon her body.

On March 10, 1972, Miller signed another statement admitting to the murder of Donna Roberts, and giving considerable detail about her murder and the transportation of her body.

Each statement was witnessed by Geoghan and Mayer, who both stated that Miller had voluntarily led them to the murder scenes and to the places where the

bodies were deposited thereafter. Each statement also contained Miller's written acknowledgment of his rights. As a result of this investigation and the confessions, Miller was arrested on March 17, 1972, and was indicted by a grand jury on May 15, 1972, for the five murders listed above.

On the date of Miller's indictment, attorney Herbert Bundock was appointed to represent him. Bundock had been an assistant public defender for Fairfield County for ten years prior to his appointment to represent Miller. Although his position was part time, he spent practically full time on the job. Miller pleaded not guilty to all five counts and the case was continued to June 20, 1972, pending the filing of any pretrial motions.

On June 6, 1972, Bundock filed a motion for discovery which included a request for all exculpatory information in the possession of the prosecution. Bundock also obtained two pychiatric reports, dated April 14, 1972, and May 6, 1972, both of which confirmed that Miller was competent to stand trial. Bundock also reached an agreement with Joseph Gormley, the state's attorney involved in the case, which allowed him free access to the state's file on the Miller case. Gormley testified at the habeas corpus hearing that he was reasonably certain that Bundock had seen practically the entire file.

From the date of his appointment through the end of 1972, Bundock worked on Miller's case. He had a psychiatrist, Johnathan M. Himmelhock, appointed by the court and, from conversations with Himmelhock, Bundock concluded that the doctor would testify that Miller was insane.

Bundock also spoke with Miller and his father on several occasions during this time. Benjamin Miller, Sr., told Bundock, on April 1, 1972, that his son had stated that he was sick and had signed a confession, but that

he would sign anything. Miller, Jr., corroborated this version of the events on September 12, 1972. He stated that he had been afraid of a beating when he signed the statements and that, after they showed him photographs of the bodies many times, they drove him to the murder scenes and asked him if this was the place. He said he would respond by saying "I think so" to please them. He also stated that the police had repeatedly asked him to confess to the murders, had harrassed him, and had called him a liar. At no time did Bundock use any of this information to file a motion to suppress Miller's confessions. Rather, he came to an agreement with Gormley that Miller should plead not guilty by reason of insanity. Gormley agreed to present only a prima facie case under those circumstances. Both the plaintiff and his father willingly participated in that plea.

On July 29, 1972, Robert F. Lupinacci was apprehended in the act of attempting to strangle a black prostitute. The crime occurred in the same area as those of which Miller was accused. The report of this incident was eventually turned over to Gormley because of the similarities between the crimes.

Lupinacci was a known patron of Stamford's black prostitutes and he was allegedly in the downtown area on the night that Gloria Kahn disappeared. Lupinacci also admitted to having taken other prostitutes to the same place where the assault occurred. He frequently used pornographic literature and drove a car similar to one which had been seen in the same area where the body of Gail Thompson had been found.

A Stamford police officer informed the state trooper who was investigating the Lupinacci case that during the Alma Henry and Gail Thompson investigations, Lupinacci had inquired about the location and duration of police stakeouts relative to those investigations. Lupinacci had further commented that not all of the

murders had been committed with bras, a fact not known to the public.

The Miller case was opened because of the Lupinacci investigation. That fact was reported in the newspaper and was brought to Bundock's attention in the form of a scrapbook put together for him by Miller, Sr. During the investigation, the state police sent twenty-three items of evidence, obtained at the scenes of the murders with which Miller was charged, to the FBI for comparison with the Lupinacci case. In the end, however, Lupinacci was charged only with assault and the investigation was closed on September 23, 1972, with a statement that there was no solid evidence connecting Lupinacci to the killings of which Miller was accused. Gormley never offered the Lupinacci file to Bundock, nor did the evidence show that Bundock had ever requested it.

On January 30, 1972, Miller was found not guilty by reason of insanity of the murders of Donna Roberts, Gail Thompson and Alma Henry for which he was tried. He was ordered confined to Fairfield Hills pursuant to General Statutes § 53a-47 (c)[2] pending an examination

---

[2] General Statutes (Rev. to 1971) § 53a-47(c), at the time of Miller's confinement, provided: "(1) Upon certification by the superintendent of the hospital or institution that, in his opinion, such person is no longer mentally ill to the extent that his release would constitute a danger to himself or others, the court may order the release of the person confined at the expiration of thirty days from the time such certificate is filed. (2) At the time such certificate is filed with the court, a copy shall be furnished to the state's attorney or prosecutor who may request a hearing as to whether such person should be released. At such hearing, evidence of mental condition may be submitted. The confined person shall be released unless the state establishes by a preponderance of the evidence that such person is, at the time of hearing, mentally ill to the extent that his release would constitute a danger to himself or others. (3) The superintendent shall, during such confinement, submit to the court at least every six months a written report with respect to the mental condition of such person. Copies of such report shall be furnished to the state's attorney or prosecutor and counsel for the confined person. The court, upon its own motion or at the request of the parties, may at any time hold a hearing to determine whether

to determine whether he was a danger to himself or to others. At a hearing on March 29, 1973, Miller was found to be a danger to himself and to others and was confined to the custody of the commissioner of mental health. Miller has never disputed the validity of the March 29, 1973 proceedings, and, since his confinement, the superintendent of Fairfield Hills has filed reports every six months as required by General Statutes § 53a-47 (c) (3), concluding that Miller's release would still constitute a danger to himself or to others.

On January 21, 1982, nearly nine years after Miller was committed, he filed the present petition seeking a writ of habeas corpus claiming, essentially, two grounds therefor: (1) that he received ineffective assistance of counsel in violation of his constitutional rights; and (2) that the state's attorney withheld exculpatory information from him. The trial court concluded that Miller failed to prove either claim and, further, that Miller, by failing to appeal from the March 29, 1973 order committing him to the custody of the commissioner of mental health, was barred from presenting these claims for the first time in a habeas corpus petition.

In this appeal, Miller claims that the trial court erred: (1) in holding that he had failed to prove that he had not deliberately bypassed his right to appeal from the March 29, 1973 confinement order; (2) in holding that the prosecution did not withhold exculpatory information from him; and (3) in holding that his counsel was not ineffective, in violation of his rights under the sixth and fourteenth amendments to the constitution of the United States. We conclude that although the court erred in its application of the "deliberate bypass" rule,

such person should be released prior to the expiration of the maximum period, in accordance with the standards set forth in subdivision (1), provided such a hearing shall be held at least every five years."

that error was harmless in light of the court's correct conclusions as to the merits of the petition.

The trial court concluded that "the Petitioner cannot for the first time raise any issue as to the impropriety of [the commitment hearing of March 29, 1973] by habeas corpus. *Vena* v. *Warden,* 154 Conn. 363 [225 A.2d 802 (1966)]; *Blue* v. *Robinson,* 173 Conn. 360 [377 A.2d 1108 (1977)]." This conclusion misses the point of Miller's claims, for they do not relate to the commitment hearing, but to the original acquittal. Miller testified that he was never told of his right to appeal from his acquittal by reason of insanity. He never testified about whether he was told that he could appeal from the subsequent commitment order. Consequently the court concluded that he had failed to prove that he had not deliberately bypassed his right to appeal from the later order.

In *Vena* v. *Warden,* supra, the court stated that "a petitioner may collaterally raise federal constitutional claims in a habeas corpus proceeding even though he has failed to appeal his federal constitutional claims directly to us if he alleges and proves, by a fair preponderance of the evidence, facts which will establish that he did not deliberately bypass the orderly procedure of a direct appeal." Id., 366–67. Since Miller's constitutional claims do not arise out of the commitment order, but out of his acquittal, it was that judgment, if any, from which he should have been required to appeal.

Not only did Miller testify that he was not told of his right to appeal from his acquittal,[3] but the claims which

---

[3] We face, at this point, what appears to be a case of first impression in this country: Whether Miller could have appealed from the court's judgment of *not guilty* by reason of insanity. Since, in our view of the case, it is not necessary to rule on this issue, we decline to do so. We note, however, that, looking to the substance of the effect of this judgment on the plaintiff rather than to the form of the proceedings, he was thereafter subject to confinement in a state mental institution for up to twenty-five years

he raises in this petition are "more properly pursued on a petition for new trial or on a petition for a writ of habeas corpus rather than on direct appeal." *State* v. *Gregory,* 191 Conn. 142, 145, 463 A.2d 609 (1983), quoting *State* v. *Mason,* 186 Conn. 574, 578–79, 442 A.2d 1335 (1982); see also *State* v. *Chairamonte,* 189 Conn. 61, 64–65, 454 A.2d 272 (1983).

Although each of the cases cited immediately above dealt only with claims of ineffective assistance of counsel, the same rationale used therein applies to the present claim regarding the prosecutor's failure to turn over to Bundock alleged exculpatory evidence which would not ordinarily be part of the record in a direct appeal. In *State* v. *Chairamonte,* supra, the court, referring to its role in a direct appeal, stated: "Our role in a case like this, however, is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. Without a hearing in which the reasons for counsel's decision may be elicited, any decision of ours on this claim would be entirely speculative." Id., 64; see also *State* v. *Mason,* supra, 579. Similarly, without a hearing in which Gormley's reasons for failing to disclose the Lupinacci evidence are elicited, and in which that evidence itself is provided, we would have an insufficient basis for deciding the merits of Miller's claim. See *State* v. *Grasso,* 172 Conn. 298, 301, 374 A.2d 239 (1977). Consequently, under the circumstances of this case it would have been inappropriate for Miller to raise either of these claims through a direct appeal.

---

which, of course, would not have occurred had he elected to go to trial and had he been found not guilty. Thus, to some extent, he is aggrieved of the trial court's judgment as required by Practice Book § 3000, even though that judgment conformed to his plea. Practice Book § 945, however, requires the court to notify the defendant of his right to appeal only where there has been a *conviction*. At the very least, his right to appeal directly was so questionable that his failure to take such an appeal should not bar our consideration of his habeas corpus petition.

In *State* v. *Mason,* supra, however, the court stated: "We note that a defendant may well be forced to raise a claim of ineffective assistance on direct appeal, even when the record is inadequate for review, because of the possibility that if this is not done collateral review of the claim may be precluded by a finding that the appellate process has been deliberately bypassed. . . . Whether there has been a deliberate bypass . . . must be determined on a case by case basis." (Citations omitted.) Id., 579 n.3. This statement cannot be construed as a prohibition of habeas corpus petitions in the absence of a prior direct appeal. Rather, it is merely a caution to counsel reminding them of the risks of such a petition. Under the circumstances of this case, however, we can find no fault in Miller's failure to directly appeal.

We conclude that because Miller's claims in this petition, in all likelihood, could not have been successfully appealed directly, there was no violation of the deliberate bypass rule in this case.

With regard to the merits of the constitutional claims raised by Miller's petition, those claims arise, to a great degree, out of the circumstances of the Lupinacci investigation. In that context, Miller seeks to augment the trial court's findings of fact with his own discussion of that investigation. Miller's claimed facts presented with regard to the Lupinacci investigation include the following: Lupinacci was a regular patron of Stamford's prostitutes. He was seen cruising in his car on the night of Gloria Kahn's disappearance, and was positively identified by another prostitute as having tried to pick her up on that same night.

On the night of Lupinacci's arrest, his car was searched and in the trunk was a deck of pornographic playing cards. One card was missing from the deck and a similar card had been found at the scene of the Gail

Thompson murder. Vacuum sweepings of the trunk also disclosed a "negroid limb hair." Lupinacci's car had also been seen at the area of the murders on prior occasions. Lupinacci was described as hating blacks and as a "sex nut" who had a history of sexually molesting women and who had been accused of rape in the past. He also, apparently, went to great lengths to devise a way to look up from a basement work site under the dresses of women walking by on the street. He was known to frequent bars which Rosell Rush was known to patronize, and he was a known patron of both Gail Thompson and Gloria Kahn.

In addition, Miller would further augment the court's findings of fact by adding a summary of the testimony of Michael Sheldon, a professor at the University of Connecticut School of Law, from the habeas corpus hearing. Professor Sheldon testified at length about the quality of Bundock's handling of Miller's case. It is sufficient for us to state that he made clear his opinion that Bundock's handling of the matter was not competent. The trial court did not, however, credit Sheldon's opinion which, of course, it was free to reject.

We note at the outset of our consideration of Miller's claims that they arise in a procedurally confused context. Ordinarily, claims of procedural misconduct or ineffective assistance of counsel arise after the accused has been found guilty. Here, however, Miller claims that he should have been acquitted unconditionally rather than by reason of insanity. Accordingly, the tests by which courts have traditionally decided the validity of claims such as those presented here do not mesh well with the facts of this case.

Miller claims that Bundock's failures as counsel were "glaring" and "legion." Specifically, he points to Bundock's lack of research into the Lupinacci case and to his failure to challenge the validity of Miller's con-

fessions although Miller had provided him with cause to dispute whether they had been made voluntarily. These failures, however, must be viewed in light of the agreement reached between the state and Bundock regarding Miller's insanity plea.

The standard used to review claims of ineffective assistance of counsel is whether defense counsel's performance was "reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." *State* v. *Clark,* 170 Conn. 273, 283, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976), quoting *Gentry* v. *Warden,* 167 Conn. 639, 646, 356 A.2d 902 (1975); see also *Levine* v. *Manson,* 195 Conn. 636, 639, 490 A.2d 82 (1985); *State* v. *Chairamonte,* supra, 63. The burden here is on Miller to prove that counsel did not meet this standard; *Levine* v. *Manson,* supra, 640; *State* v. *Chairamonte,* supra; *State* v. *Clark,* supra; and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* v. *Washington,* 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984).

"[A] court will not second guess the tactics and strategy chosen by trial counsel after reasonable investigation and research." Whitehead, Constitutional Criminal Procedure, 371–72; see also *Strickland* v. *Washington,* supra, 689; *Aillon* v. *State,* 597 F. Sup. 158, 164 (D. Conn. 1984); *Levine* v. *Manson,* supra, 648. Although we might, given the benefit of 20/20 hindsight, conclude that Bundock's approach was not the best possible one, "the claim of ineffective representation must be examined as of the time the questioned representation occurred." *Levine* v. *Manson,*

supra, 649; *Siemon* v. *Stoughton,* 184 Conn. 547, 554, 140 A.2d 210 (1981). Bundock knew of the Lupinacci investigation long before Miller's trial and, as the court below found, "on the strength of all the information available to him he had come to the conclusion that the best defense for his client was a plea of not guilty by reason of insanity." This decision required Bundock to consider the possibility of conviction for all five murders for which he was indicted and a resulting possible maximum sentence of 125 years; General Statutes § 53a-35 (c) (1) (Rev. to 1971); as well as the possibility of acquittal of the charges if he chose to pursue a complete acquittal. His decision to opt for the security of an agreement with the prosecution was well within the bounds of prudent advice to his client. It certainly did not "so [undermine] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" as required by *Strickland* v. *Washington,* supra, 686. Nor has Miller established that, but for Bundock's decision, the result for him would have been different, i.e., that he would have been acquitted of the charges against him. Id., 2068. We conclude, therefore, that Miller has not sustained his burden of proving a violation of his constitutional right to the effective assistance of counsel.

Miller's second claim is that Gormley committed misconduct by failing to provide Bundock with the exculpatory evidence contained in the Lupinacci file. This claim is premised upon the holding in *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), where the Court stated that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." Id., 87.

In cases, such as the present one, where only an initial general request for "any exculpatory information

or material" has been made, it has been held that "there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases . . . in which there has been no request at all." *United States* v. *Agurs,* 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Consequently, the test applied for determining the materiality of evidence[4] where no request has been made is equally applicable to the present case. That test is whether "the omitted evidence creates a reasonable doubt [about the defendant's guilt] that did not otherwise exist . . . ." Id., 112.

Technically, the *Agurs* test is not applicable to this case because Miller was found *not guilty* by reason of insanity. Nevertheless, since we have concluded that practical justice requires us to consider the combined effect of the finding of not guilty by reason of insanity together with the plaintiff's continued involuntary confinement at the Whiting Forensic Institute, we will apply the general principles of *Brady* concerning the prosecution's failure to disclose exculpatory evidence to this case. Accordingly, we must determine whether it is reasonably certain that the contents of the Lupinacci file should have caused Bundock to change his mind about his decision to recommend that Miller adopt an insanity plea, and that, had he done so, upon a trial after a plea of not guilty, a reasonable doubt would have been created by the Lupinacci material. Even if we assume, arguendo, that, had the Lupinacci

---

[4] With regard to the other aspect of the *Brady* test, it is beyond doubt that evidence tending to prove the guilt of a third party is exculpatory with regard to the accused. In *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the court held that "[i]f there is a duty to respond to a general request . . . it must derive from the *obviously* exculpatory character of certain evidence in the hands of the prosecutor." (Emphasis added.) Id., 107. This has been interpreted as requiring disclosure only where "the exculpatory nature of the information in the hands of the prosecutor is obvious." *State* v. *Palmer,* 196 Conn. 157, 160, 491 A.2d 1075 (1985). That standard is clearly satisfied in this case.

evidence been admitted at such a trial, it would have created a reasonable doubt, nonetheless the first part of the test is still not met in this case.

There is a point at which the prosecution must yield exculpatory evidence which has not been requested by the defense, but, as the Court said in *United States* v. *Agurs,* supra, "we have rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel . . . ." Id., 111. We must, necessarily, leave the initial determination of what to surrender voluntarily, to the prosecution. Id., 107. We can only subsequently determine whether the failure to surrender evidence was "of sufficient significance to result in the denial of the defendant's right to a fair trial." Id., 108. We conclude that, in the unusual circumstances of this case, the state's attorney's failure to turn over the Lupinacci evidence to the plaintiff did not deny the plaintiff a fair trial.

From our vantage point, twelve years after the events, we must assay the factors leading to Bundock's handling of the case as he did. He was an experienced criminal defense lawyer. He knew both the strengths and weaknesses of the state's case against his client. He knew of Miller's confessions and other highly incriminating evidence and he knew of the unanimous opinions of the psychiatrists who had examined Miller that he was insane. He knew of the probable lengthy incarceration, tantamount to the duration of his client's life, that Miller would face if he were convicted on all three counts, or possibly on all five counts upon which Miller had been indicted had he not accepted the agreement with the prosecution to plead not guilty by reason of insanity. He came to the reasonable conclusion that his client was, in fact, guilty and needed confinement in an institution and close supervision and treatment. Under General Statutes § 53a-47, the superintendent of the institution was required to file a report

with the court every six months with respect to Miller's condition. Further, General Statutes § 53a-47, at the time of Miller's commitment, placed the burden upon the state to establish, upon the preponderance of the evidence, that the defendant was mentally ill. To sum up the situation Bundock faced, he chose a path which meant that his client, against whom the evidence was sufficiently strong, not only for a grand jury to indict him on five counts of murder, but, in all likelihood, to convict him of one or more of those murders, would not go to prison but rather would either be confined in a hospital, which all medical testimony indicated was appropriate, or be released as a free man. Applying, as we do, the *Brady* exculpatory rules, we cannot conclude that, had Bundock received all of the Lupinacci data in the state's possession, his resulting analysis thereof would have been reasonably certain to cause him to handle the case differently.

There is no error.

In this opinion the other judges concurred.