[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. FACTUAL BACKGROUND OF THE HABEAS PETITION
After a fourth trial, the petitioner was found guilty on July 24, 1986 of the murders of Irving and Rhoda Pasternak. The crimes had occurred on September 26, 1974.[1] On August 29, 1986, Gold was sentenced to two concurrent prison terms CT Page 2711 of twenty-five (25) years to life.[2] He took no appeal.
On October 17, 1990[3] a petition for a Writ of Habeas Corpus was filed on behalf of the prisoner by his counsel. Appended to the Writ as Exhibit B is a document stating, "March 27, 1989. . . I hereby authorize William M. Kunstler, Victor Ferrante, Louis Nizer, Walter Scanlon, John Williams, Timothy Moynihan and lawyers associated with them to do what they can to secure my release from prison [signed] Murray R. Gold."
The pertinent allegations of illegal confinement contained within the body of the petition are: (1) that Gold was legally incompetent during the fourth trial; (2) that trial counsel rendered ineffective assistance by failing to bring to the Court's attention facts showing that Gold was not legally competent; and (3) that "the verdict in the fourth trial was highly erroneous, and therefore it is urgent that a full and expedited hearing be granted in order to avoid, in the interests of justice, a calamity which might otherwise be prevented."
Gold's third trial resulted in a mistrial when, after the public firing of his lawyer in the course of court proceedings,[4] he was found to be incompetent.[5] Gold was admitted to Whiting Forensic Institute on February 5, 1985 for evaluation.[6] Approximately eight (8) months later, during which time Gold received psychiatric treatment, the diagnostic team on October 30, 1985[7] determined that he was competent to stand trial. Based upon those findings and Gold's waiver of a hearing on the issue of competency, Judge Gill declared Gold competent on November 8, 1985.[8] Murray Gold was then transferred from Whiting and incarcerated at the New Haven Correctional Center in lieu of a $250,000.00 bond.[9]
The trial began in June, 1986. Gold had been confined to the New Haven Jail ever since his release from Whiting in November, 1985. Pursuant to a request by Judge William J. Lavery, who had been designated the trial judge for the fourth trial, Dr. Merikangas examined Gold at the jail on May 20, 1986. Attorney William Collins, whom Gold had retained, was present. Merikangas found Gold to be competent as of May 20, 1986.[10]
During the trial proceedings on July 8, 1986, as defense CT Page 2712 counsel was cross-examining the state's footprint expert, the state's attorney interrupted the proceedings, as follows:
 MR. SCANLON: If your Honor please, I think that the defendant's confrontation rights are being abandoned at this moment. I point that out to the Court.
THE COURT: Excuse me?
 MR. SCANLON: I think his confrontation rights are being abandoned voluntarily by the defendant. I did want to point this out to your Honor.
THE COURT: Why?
MR. SCANLON: He seems to be sleeping.
MR. SERIGNESE: No, he is not.
MR. SCANLON: He seems to be sleeping.
 MR. SERIGNESE: He is just resting his eyes. He is not sleeping.
 THE COURT: No, the record will note that he is — that the defendant is awake —
 MR. SCANLON: His eyes were closed. Excuse me.
THE COURT: Proceed.
MR. COLLINS: Thank you.[11]
On or about July 13, 1986, Gold's dosage of Navane, an anti-psychotic medication described by Dr. Walter Borden in the habeas proceeding as "a major tranquilizer", was increased from 15 to 20 milligrams per day.[12] There was no evidence of the person who ordered the increase in dosage or the reason why it was increased. There was no Court order superseding Judge Gill's orders of November 8, 1985. The evidence shows the increased dosage continued from July 13 through August 25, 1986. The jury returned its verdict of guilty on July 24, 1986. The Court at that time ordered an examination in accordance with Section 17-244 (now 17a-566) of the Statutes. The purpose of that examination was to determine whether or not Gold should be placed in a psychiatric facility rather than prison because he was "mentally ill and dangerous to himself or others." It was CT Page 2713 concluded that his sentence should be served in prison. Gold was sentenced on August 29, 1986. He made no statement or comment.
II. THE QUESTION OF THE SUFFICIENCY OF EVIDENCE
The petitioner's claim respecting the sufficiency of the evidence can be reduced to two main points. First, that the state's case was highly circumstantial. Second, that the evidence respecting Bruce Sanford's guilt was compelling; ergo Murray Gold is innocent.
With regard to a conviction obtained by way of circumstantial evidence, while there was no eye witness to the Pasternak murders there were ample facts introduced by way of testimony and exhibits from which logical inferences consistent with the petitioner's guilt could be drawn by the jury. There is no rule of law which prevents the State from satisfying the burden of proof beyond a reasonable doubt by circumstantial evidence. State v. Reid, 154 Conn. 37, 40
(1966); Handbook of Connecticut Evidence, Tait, Sec. 4.4.2 (2d Edition, 1988).
The jury was "privileged to adopt whatever testimony it [believed] to be credible. . . . It may disbelieve a witness as to part of his testimony and accept it in other respects. . . . Where the evidence is in conflict, its probative force is determined by the trier." Gaudio v. Gaudio,23 Conn. App. 287, 306 (1990). It is not for a habeas court to "retry a question of fact or inquire into the sufficiency of the evidence to warrant a conviction of the person imprisoned, for even if insufficient, it is error merely and not a ground for discharge in habeas corpus proceedings." Ryan v. Warden, 4 Conn. Sup. 215, 216 (1936); See also Perell v. Warden, 113 Conn. 339, 342-244 (1931). This Court, therefore, rejects the petitioner's claims with respect to the sufficiency of the evidence of guilt.
III. THE QUESTIONS OF THE PETITIONER'S COMPETENCY AND THE EFFECTIVENESS OF HIS ATTORNEY'S ASSISTANCE IN THAT REGARD.
Murray Gold's history of treatment for mental illness dated from 1974. His bizarre behavior associated with his prosecution in the instant matter commenced during the third trial from jury selection forward. The medical records introduced into evidence by both the petitioner and the respondent indicate that Gold was suffering from both paranoia and schizophrenia.[13] Between January 22, 1985 and
May 20, 1986, Gold had been found incompetent on at least CT Page 2714 four (4) different occasions. Upon his discharge from Whiting Forensic in late 1985, the diagnostic team stated the following:
 It is noted here that we consider Mr. Gold to be a mentally ill defendant who has been restored to competency. We wish to emphasize that this should not be interpreted to mean that his mental condition has been completely ameliorate. [sic] He suffers from a mental condition, in our opinion, that will require some form of continued treatment in order to maintain his competency over the course of the extended future. It is our understanding that the patient has been in the process of discussing his defense with several attorneys over the past three months. Progress in actually obtaining counsel is uncertain due to practical limits connected with his confinement here, and his own financial circumstances. Initiative has been taken in the direction of obtaining counsel according to our understanding, and a continued program of psychiatric treatment is now advised as a necessary adjunct to the maintenance of his competency.
[Petitioner's Exhibit A].
Except for the administration of Navane at the New Haven Correctional Center, there was no evidence that the petitioner was otherwise afforded continued psychiatric treatment from the time he was released from Whiting Forensic Institute through the fourth trial.
Trial counsel should have been fully cognizant of the precarious mental condition of his client, the cautions set forth by the experts, the medications Gold was taking and the prescribed and Court-sanctioned dosages. Yet, counsel testified that he was unable to recall any discussions with his client about the Whiting Forensic report of October 30, 1985. Counsel testified that he did not feel qualified to discuss Gold's treatment for mental illness nor did he ever inquire about any ongoing medical care. He was unaware of Judge Gill's order respecting medication. He was not aware of "what the medicine was supposed to do except to help the underlying condition." Counsel testified that he and the petitioner discussed the "appealable issues" and the petitioner's "demeanor did not change" from what it had been during the trial. Gold refused to appeal.[14] In light of all of the prior legal proceedings and the documented CT Page 2715 psychiatric condition of his client, it was incumbent upon trial counsel to request a competency evaluation, at least for the purpose of determining whether or not the petitioner was legally capable of waiving his right to appeal.
The United States Supreme Court "has concluded that the assistance of counsel is among those `constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" Hollaway v. Arkansas, 435 U.S. 475,489, 98 S.Ct. 1173 (1978).
In deciding whether counsel's performance has been such as to violate petitioner's constitutional right to effective assistance of counsel, this court must apply the now familiar two-prong test articulated in Strickland v. Washington,466 U.S. 668, 101 S.Ct. 2052, reh. denied 467 U.S. 1267 (1984).
 The standard used to review claims of ineffective assistance of counsel is whether defense counsel's performance was "reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."
Miller v. Angliker, 4 Conn. App. 406, 419, cert. denied197 Conn. 809 (1985), citing Strickland, supra at 694, and other cases; see also Chace v. Bronson, 19 Conn. App. 674, 677-678
(1989), Levine v. Manson, 195 Conn. 636, 640 (1985). Both determinations are mixed questions of law and fact. Strickland, supra at 698.
Apart from certain general and basic duties (of loyalty, to avoid conflicts of interest, to advocate the defendant's cause, to consult with and keep the defendant informed, to use skill and knowledge to insure a reliable adversarial testing process), "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel." Strickland, supra at 688-689. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at CT Page 2716 690.
The right to counsel in criminal proceedings is guaranteed both by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the Connecticut Constitution. The courts have long recognized that the right to counsel applies to all critical stages of criminal proceedings. Gardner v. Florida, 430 U.S. 349, 358
(1977); United States v. Daniels, 558 F.2d 122, 125, 127-128
(2d Cir. 1977); United States v. Pinkney, 551 F.2d 1241
(D.C. Cir. 1976); United States v. Robin, 545 F.2d 775
(2d Cir. 1976); United States v. Lucas, 513 F.2d 509, 511
n. 4 (D.C. Cir. 1975); United States v. Johnson, 475 F.2d 1297,1299-1300 (D.C. Cir. 1973). Certainly, the right to appeal is a critical stage.
 Such a significant protection of liberty as a right to appeal made available to all persons convicted of crimes, must be viewed as fundamental, althought its basis is statutory rather than constitutional. Coppedge v. United States, 369 U.S. 438, 441, 82 S.Ct. 917, 81, 590, 592 (7th Cir. 1970). In the exercise of such a right, invidious discriminations, such as between rich and poor, implicate constitutional guarantees of due process and equal protection of the laws. Douglas v. California, 372 U.S. 353, 355, 83 S.Ct. 814, 9 L.Ed.2d 811, reh. denied, 373 U.S. 905, 83 S.Ct. 1288, 10 L.Ed.2d 200 (1963); Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891
(1956). Since the state has established an appellate forum, "these avenues must be kept free of unreasonable distinctions that can only impede open and equal access to the courts." Rinaldi v. Yeager, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); see Blackledge v. Perry, 417 U.S. 21, 25, 94 S.Ct. 2098, 40 L.Ed.2d 628
(1974); Chaffin v. Stynchcombe, 412 U.S. 17, 24
n. 11, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973); Staton v. Warden, supra, 334.
 A waiver of such a fundamental right can be found only where it is clearly established that there has been "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Talton v. Warden, 171 Conn. 378, 384, 370 A.2d 965 (1976).
D'Amico v. Mason, 193 Conn. 144, 147 (1984). CT Page 2717
Counsel's conduct at the time the petitioner refused to appeal, was not reasonably competent nor was it within the range of competence of Connecticut attorneys practicing criminal law. He should have requested an evaluation in accordance with Section 54-56d of our statutes. Had counsel requested a competency evaluation at the time an appeal was under consideration, there is a reasonable probability that an appeal would have been taken. Having concluded that there was not a voluntary, knowing and intelligent waiver of his right to appeal, the Court must logically conclude that there has not been a deliberate bypass of appeal for the purpose of entertaining the issues raised in the Habeas Corpus petition.
Section 54-56d of our Statutes mandates that "[a] defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense." The only expert medical evidence of Gold's competency during the fourth trial that was presented to this Court, was the testimony of Dr. Walter Borden. Borden examined Gold on December 21, 1990. He conducted a two (2) hour examination. He also reviewed all medical/psychiatric records, including Dr. Merikangas's reports, as well as the transcripts of the trials and other court proceedings. Based upon his examination and review, he opined that the petitioner was not legally competent to stand trial during the fourth trial. He stated that the increase in the dosage of Navane indicated a deterioration of Gold's mental condition.
Attorney Williams who had been Gold's lawyer during the third trial testified that he observed a few minutes of the fourth trial one day when he happened to be in Waterbury on other business. Evidence was being taken. The jury was present. Williams stated, "I was struck by the fact that he [Gold] seemed to be in a trance. He was staring straight ahead. He wasn't reacting to anything going on in the courtroom. He did not even react to my presence in the courtroom. . . His eyes were open but he wasn't moving. He was simply occupying a chair."
Williams' testimony, Scanlon's observations on the record and Dr. Borden's findings were in sharp contrast to the findings of Dr. Merikangas on May 20, 1986. Dr. Merikangas testified that on May 20, 1986 he found Gold "alert, oriented and cooperative." He concluded that Gold's condition was "in remission" at that time.
This Court is persuaded, based upon that evidence and CT Page 2718 the other facts and circumstances hereinbefore enumerated that at some time between May 20, 1986 and July 24, 1986, the petitioner became legally incompetent. As a result, he has been denied due process of law.
 The conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. Conn. Const., art. I, Sec. 8; U.S. Const., amend. XIV, Section 1; see Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 91966). This rule "imposes a constitutional obligation, [on the trial court], to undertake an independent judicial inquiry, in appropriate circumstances, into a defendant's competency to stand trial. . . ." State v. Watson, supra, 605; see Drope v. Missouri, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); State v. DeAngelis, 200 Conn. 224, 242, 511 A.2d 310
(1986). "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope v. Missouri, supra, 181. This constitutional mandate is codified in General Statutes Sec. 54-56d(a), which provides that "[a] defendant shall not be tried, convicted or sentenced while he is not competent."
State v. Gonzalez, 205 Conn. 673, 686-687 (1987). Unlike the facts of Gonzalez, Gold was never evaluated for legal competency by any medical expert between the commencement of jury selection through the expiration of the appeal period.
Gaines v. Manson, 194 Conn. 510 (1984) established that in the adjudication of petitions for habeas corpus, the remedies available to a court depend upon the constitutional rights being vindicated. The court has the power to dispose of the case as "law and justice require".
In the interests of justice therefore, this Court finds that the petitioner is entitled to a new trial and that he should be retried once it has been determined that he is legally competent to stand trial. The Court hereby appoints the Commissioner of Mental Health to conduct a competency evaluation in accordance with the provisions of 54-56d of our General Statutes, as amended. The Commissioner is specifically requested to address the following questions: CT Page 2719
1. Is Murray Gold presently legally competent to stand trial?
2. If he is not now legally competent to stand trial is there any reasonable likelihood that he will be restored to legal competency in the forseeable future?
3. If he either currently is legally competent or if he can be restored to such competency in the forseeable future, what specific treatments and/or procedures should be implemented to maintain competency and satisfy the trial court that he continues to be legally competent?
4. If not presently legally competent, what is the appropriate in-patient facility for treatment to restore competency?
SCHEINBLUM, J.