Benjamin F. MILLER, Jr.,
Petitioner–Appellant,

v.

Colin C.J. ANGLIKER, M.D., Director,
Whiting Forensic Institute,
Respondent–Appellee.

No. 630, Docket 87–2355.

United States Court of Appeals,
Second Circuit.

Argued Jan. 19, 1988.
Decided May 20, 1988.

John R. Williams, New Haven, Conn. (Williams & Wise, New Haven, Conn., on the brief), for petitioner-appellant.

Frederick W. Fawcett, Asst. State's Atty., Bridgeport, Conn., for respondent-appellee.

Before LUMBARD, KEARSE, and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner Benjamin F. Miller, Jr. ("Miller"), having been committed to the custody of the Commissioner of Mental Health of the State of Connecticut ("State") in 1973 after being found not guilty of certain murders by reason of insanity, appeals from a judgment of the United States District Court for the District of Connecticut, Ellen Bree Burns, *Judge*, denying his petition for a writ of habeas corpus. Miller contended principally that his confinement resulted from (1) violation of his Sixth Amendment right to the effective assistance of counsel, and (2) violation of his due process right to be provided with exculpatory information in the possession of the State, both of which affected his decision to plead insanity rather than simply not guilty. The district court denied the petition on the grounds that the courses of action followed by Miller's attorney did not constitute ineffective assistance and would not necessarily have been different had the exculpatory information been disclosed to him. On appeal, Miller contends principally that the district court failed to apply the proper legal standard in assessing the materiality of the information withheld by the State.

For the reasons below, we agree and, finding merit in the due process contention, we reverse with instructions that the writ be granted unless the State elects to bring Miller to trial.

## I. BACKGROUND

During the period 1967 through 1971, a number of young black prostitutes were found strangled in a wooded area of Stamford, Connecticut, adjacent to the Merritt Parkway. Miller was indicted in 1972 for five such murders. In 1973, pursuant to an agreement between prosecution and defense, two counts were withdrawn, and Miller pleaded not guilty by reason of insanity. The State joined in urging the three-judge panel before which the case was tried to accept the insanity defense, and Miller was found not guilty by reason of insanity.

The constitutional claims pursued on this appeal stem from the fact that, prior to the plea agreement leading to Miller's decision to rest on the insanity defense, the State possessed and did not disclose to Miller evidence that connected another individual, Robert Lupinacci, at pertinent times and places, with at least four of the five women alleged to have been killed by Miller. Lupinacci had been arrested in July 1972 as he was attempting to strangle a black prostitute in the same area in which the other victims had been found.

The following description of the events is taken largely from an October 1983 state court opinion in this matter, which was relied on by the district court.

### A. *The Events and the Investigation of Miller*

On August 4, 1967, the body of Rosell ("Sissy") Rush, a young black woman, was found strangled near River Bank Road in a wooded area off the Merritt Parkway in Stamford. On May 3, 1968, and September 8, 1968, respectively, the similarly strangled bodies of Donna Roberts and Gloria Kahn, also young black women, were discovered in the same area. The crimes were not quickly solved.

Miller, a white postal worker who claimed to be an ordained minister, spent a great deal of his time preaching to blacks on street corners in Stamford, and especially to black women. He had a history of mental illness and had been hospitalized at Fairfield Hills State Hospital ("Fairfield Hills") as early as 1953.

Miller first came to the attention of police investigating the Rush, Roberts, and Kahn murders after a Reverend James Miller (apparently not related to petitioner) of Stamford reported receiving an anonymous telephone call in April 1969 from someone having the voice of a black male, describing the location of an as yet unfound body and expressing a wish that the deceased woman receive "a Christian burial." The investigators then sought to list all Millers who were clergymen in the area, and they included Miller's name among them. After three more bodies were discovered, they invited Miller to be interviewed. They apparently did nothing to pursue him, however, when Miller responded that he was too busy with church work to be interviewed.

On July 10 and August 22, 1971, the strangled bodies of Gail Thompson and Alma Henry, respectively, were found in the same area where the bodies of Rush, Roberts, and Kahn had been found. There had been a substantial amount of publicity in the Stamford area with respect to the series of killings, and the black community and other groups had expressed anger at the lack of any progress in solving the murders. By January 1972, a special team of state and local police detectives had been assigned to the cases on a full-time basis. These investigators began to follow up the earlier mention of Miller and learned of his psychiatric history and his contacts with black women.

Over the course of the next few weeks, the detectives interrogated Miller several times and at length. Miller denied that he had committed the murders but admitted having "had sexual relations with Gail Thompson in [his] car in North Stamford." Though the autopsy report on Thompson did not reveal recent sexual intercourse, certain of Miller's other statements accu-

rately recited theretofore unpublished information related to the murders. For example, when the detectives showed Miller a picture of the body of Thompson and asked what he thought was around her neck, Miller responded, correctly, that it was a handkerchief; the public information was that Thompson had been strangled with a brassiere. A polygraph test of Miller's denial that he had committed the murders proved inconclusive, apparently because of his erratic behavior.

During an interrogation session on February 16, 1972, the detectives suggested that Miller speak with Dr. Robert Miller (apparently not related to petitioner), a psychiatrist at Fairfield Hills whom the investigators had consulted with regard to Miller in January. Miller refused to see Dr. Miller but agreed to see Dr. Shirley Williams, a psychiatrist he had consulted previously, at Norwalk Hospital. After Miller was seen by Dr. Williams and another psychiatrist, he was involuntarily committed to Fairfield Hills. Upon his admission to that hospital, Miller was found to be suffering from chronic undifferentiated schizophrenia. He was placed on suicide watch at times and was regularly administered medication. The hospital records indicated that "he is delusional, religosity [*sic*] is in evidence, low self-esteem, flat affect, thought disorders, poor judgment and insight."

During his stay at Fairfield Hills, Miller was interviewed a number of times by Dr. Robert Miller. As a result of these sessions, Dr. Miller told the investigators he believed Miller had committed the murders and encouraged them to continue investigating Miller. On February 29, Dr. Miller called the detectives and reported that Miller wished to speak with them.

After the detectives arrived at Fairfield Hills on February 29 and advised Miller of his rights, Miller wrote on a pad that he had killed seven women. He later stated that he had killed Thompson, Henry, Rush, and others he could not remember. He described the murder of Thompson in detail and made a more general statement about killing three others. On March 1, Miller signed typed versions of the statements he had made on February 29, and he accompanied the detectives to the area where the bodies had been found. He reenacted the Thompson murder and led them to the spots where three other bodies had been found.

On March 2, Miller signed a detailed statement admitting the murder of Henry. On that day he accompanied the officers to the Merritt Parkway and pointed out the spot where Henry's body had been found. On March 10, Miller signed a detailed statement admitting the murder of Roberts. At various times he also signed statements describing his trips with the officers to the scene of the murders.

Miller was placed under arrest on March 17, 1972, and on May 15, he was indicted for the murders of Rush, Roberts, Kahn, Thompson, and Henry.

B. *The Preparation of Miller's Defense*

Upon Miller's arraignment, Herbert J. Bundock, a public defender in Fairfield County since 1962, was appointed by the court to represent him. Joseph T. Gormley, Jr., the State's attorney in charge of the prosecution, informed Bundock that Dr. Robert Miller believed Miller could be found not guilty by reason of insanity. Gormley stated that if Miller would agree to plead insanity, the State would present only a prima facie case.

Bundock interviewed Miller, Miller's father ("Miller Sr.") and Dr. Williams, and reviewed Miller's psychiatric records. Miller Sr. told Bundock that Miller had telephoned Miller Sr. in February and said he had signed a confession but that he was sick and would have signed anything.

Miller told Bundock that during the first several interrogations, the investigators had repeatedly tried to get him to confess to the murders, but that Miller had denied killing the women. He said Dr. Robert Miller too had tried to get him to confess and had shown him a statement that he could sign in order to plead not guilty by reason of temporary insanity, but that his response was to ask Dr. Miller whether the latter "want[ed Miller] to ... confess to

something I didn't do." Miller stated that he had eventually confessed while under the influence of the medication given him and that Dr. Miller and another doctor had broken him down. Bundock did not interview Dr. Miller or anyone else on the staff of Fairfield Hills.

Miller told Bundock he had given the confessions on February 29, March 2, and March 10 because he was frightened and was afraid of receiving a beating, and because the detectives told him that unless he confessed he would lose his job and his family would suffer. He was also concerned that, because he had admitted adulterous conduct with black women, the police would arrest him for adultery and his wife would divorce him. He told Bundock that the detectives had asked him leading questions and he merely gave them the right answers. They had shown him pictures of the murder scenes many times; when they drove him to the site of the murders and asked him if they were in the right place, he had said "I think so" to please them.

Bundock had Miller evaluated by a court-appointed psychiatrist and in mid-December 1973 received a report. The report stated that although it was certain that Miller "is and has been chronically psychotic and delusional and totally incapable of discerning right from wrong," and that "[t]he force of his insanity drove him into the midst of the daily life of the people he is accused of having murdered," the psychiatrist had "no certain idea" whether Miller had actually committed the murders.

### C. *Robert Lupinacci*

Shortly after Bundock commenced the preparation of Miller's defense, the police arrested Robert Lupinacci on July 29, 1972, as he was attempting to strangle a black prostitute in the same area in which Miller's alleged victims had been found. Thereafter, Miller Sr. sent Bundock a packet of clippings and ideas for investigation, including articles that described the arrest of Lupinacci and indicated that the investigation of all the murders might be reopened. Bundock, convinced that Miller's

confessions revealed details that he would have known only if he were the killer, did not investigate the possibility that Miller did not commit the murders and did not pursue any investigation regarding Lupinacci.

The State's file on Lupinacci, which is included in the present record, included the following information. Lupinacci was considered a "sex nut," was known to patronize black prostitutes, and referred to blacks disparagingly. The bodies of three of the women allegedly killed by Miller had been found within 100 feet of the spot where Lupinacci was arrested; Lupinacci's car had been seen near the murder scenes several times. In addition, in 1967, Lupinacci had been seen in bars in the vicinity of Port Chester, New York, which is near Stamford; Rush, just prior to her death in 1967, also had frequented bars in Port Chester. In 1968, employees at the Hotel Hazelton had seen Lupinacci there; Kahn, killed in 1968, was a resident of that hotel. Lupinacci had been seen cruising the Stamford area on the night Kahn was killed. In 1971, Lupinacci worked at a motel at which Thompson, killed in 1971, resided. Lupinacci was known to sell pornographic playing cards, and in the trunk of his car police found a pornographic deck with the queen of hearts missing; a similar card had been found near Thompson's body. Thompson was last seen alive in a vehicle resembling Lupinacci's car, and such a vehicle was seen near the scene of Thompson's murder. A vacuum sweeping of the trunk of Lupinacci's car revealed negroid limb hairs. In August 1971, Henry was last seen alive on Grey Rocks Place in Stamford. Lupinacci was a member of a club then located on Grey Rocks Place.

A local police officer reported that during the investigations of the deaths of Thompson and Henry, Lupinacci had inquired about the location and duration of police stakeouts related to those investigations. In addition, Lupinacci had commented that not all of the victims had been strangled with brassieres, a fact that was not known to the public.

Because of the similarity between the crimes of which Miller was accused and the act in which Lupinacci was caught, the detectives who investigated Lupinacci turned over complete reports of the information gathered to Gormley. In June 1972, Bundock had moved for the production of all exculpatory information in the possession of the prosecution. Gormley, agreeing that Bundock could have free access to the State's file on Miller, never formally responded to Bundock's request. The State did not offer access to its file on Lupinacci and never turned over to Bundock any of its information on Lupinacci.

### D. *The Trial*

Sometime after the arrest of Lupinacci and before receiving the report of the court-appointed psychiatrist, Bundock negotiated a plea bargain with Gormley pursuant to which two of the murder counts would be dropped and Miller would enter an insanity defense on the remaining counts. Accordingly, in January 1973, the State withdrew the charges with regard to Rush and Kahn, and Miller pleaded not guilty by reason of insanity on the charges that he had killed Roberts, Thompson, and Henry.

A one-day trial on the three remaining charges against Miller was held before a three-judge panel of the Connecticut Superior Court for Fairfield County. Under Connecticut law, the trier of fact may not enter a verdict of not guilty by reason of insanity unless it finds beyond a reasonable doubt that the defendant has in fact committed the acts with which he is charged. *See State v. Warren,* 169 Conn. 207, 363 A.2d 91 (1975). Accordingly, at the trial, the State presented a prima facie case, which consisted primarily of Miller's confessions. Miller presented his insanity defense through the testimony of Dr. Robert Miller and Miller's court-appointed psychiatrist. Both Gormley and Bundock urged the court to accept the insanity defense. The court, after a brief recess, found Miller not guilty by reason of insanity.

In March 1973, pursuant to Conn.Gen. Stat.Ann. § 53a–47 (West 1972) (*repealed*

*by* 1985 Conn.Acts 506, § 31), the panel held a hearing to determine whether Miller's current mental state warranted his confinement in a mental hospital. The court found it established by a preponderance of the evidence, *see id.* § 53a–47(a)(4), that Miller was currently mentally ill to such an extent that he posed a danger to himself and to others. Accordingly, the court committed him to the custody of the commissioner of mental health for a term of confinement not to exceed 25 years. Miller has remained so confined since 1973.

### E. *The Habeas Proceedings*

In 1982, Miller sought habeas relief in state court, contending principally (1) that Bundock's failure to pursue the Lupinacci line of inquiry and certain other procedural strategies, such as a motion to suppress the confessions, violated his right under the Sixth Amendment to the effective assistance of counsel, and (2) that the State's failure to turn over to Bundock its file on Lupinacci violated his due process right to be given any exculpatory information in the possession of the prosecution, *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After an eight-day evidentiary hearing at which Bundock, Gormley, and others testified, the court made exhaustive findings of fact and denied relief. (*See* Memorandum of Decision Re: Petition for Writ of Habeas Corpus ("State Habeas Court Decision") dated October 13, 1983.)

In assessing Miller's claims, the court expressed "substantial doubt" as to whether the Lupinacci information possessed by the State would have been admissible at trial, noting that " '[o]rdinarily, evidence concerning a third party's involvement is not admissible until there is some evidence which directly connects that third party with the crime.' ... '[I]t is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person.' " (State Habeas Court Decision at 44 (quoting *State v. Kinsey,* 173 Conn. 344, 348, 377 A.2d 1095, 1097 (1977), and *State v. Renteria,* 21 Ariz.

App. 403, 404, 520 P.2d 316, 317 (1974), *quoted in State v. Giguere,* 184 Conn. 400, 405, 439 A.2d 1040, 1043 (1981)).) The court rejected Miller's claim of ineffective assistance of counsel because it concluded that Bundock's performance had not been ineffective, in that Bundock had acquired sufficient information to make an informed recommendation to Miller. The court rejected Miller's claim under *Brady v. Maryland* on the ground that "the information in the hands of the State's Attorney was [not] sufficient to create a reasonable doubt that did not otherwise exist." (State Habeas Court Decision at 38.) It apparently believed that the withheld information showed "mere[ ] similarities in crimes committed by two different individuals" (*id.*), that the information was not proper *Brady* material, and that the public information available to Bundock had "provided the defendant with an opportunity to discover the information he now alleges the prosecutor suppressed" (*id.*).

The court also ruled that Miller was not entitled to attack alleged constitutional deprivations that occurred prior to his January 1973 trial, reasoning, in effect, that Miller was not aggrieved by the events leading to that trial because "[h]e was acquitted." (*Id.* at 30.) The court viewed the habeas petition as an improper attack on Miller's confinement because his commitment on the ground that he was a danger to himself and others resulted from a proceeding that (a) was separate from the trial at which he was found not guilty by reason of insanity, and (b) focused on his mental state in 1973 rather than on his mental capacity at the times of the killings. Noting that Miller had not appealed from the March 1973 order of confinement, the court ruled that he was barred from presenting his claims by way of his habeas corpus petition.

The Connecticut Court of Appeals rejected the habeas court's view that Miller was barred from pursuing his habeas claims, but, endorsing its findings of historical fact, affirmed the denial of the writ on the merits. 4 Conn.App. 406, 494 A.2d 1226 (1985). As to the *Brady v. Maryland* claim, the appellate court found that the

Lupinacci evidence was "clearly" and "obvious[ly]" exculpatory of Miller, *id.* at 421 n. 4, 494 A.2d at 1235 n. 4; but it believed that the test as to the materiality of withheld exculpatory evidence established by *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976), was not technically applicable to Miller's case "because Miller was found *not guilty* by reason of insanity," 4 Conn.App. at 421, 494 A.2d at 1236 (emphasis in original). Applying more general principles, the court stated that the pertinent question was

> whether it is reasonably certain that the contents of the Lupinacci file should have caused Bundock to change his mind about his decision to recommend that Miller adopt an insanity plea, and that, had he done so, upon a trial after a plea of not guilty, a reasonable doubt would have been created by the Lupinacci material.

*Id.* Concluding that Bundock would have handled the case in the same way even if he had received all of the Lupinacci data in the State's possession, the court found no error in the denial of the writ. Leave to appeal to the Connecticut Supreme Court was denied. 197 Conn. 809, 499 A.2d 59 (1985).

In 1986, Miller filed his present petition for habeas corpus in the district court pursuant to 28 U.S.C. § 2254 (1982), pursuing his *Brady v. Maryland* claim and his claim of ineffective assistance of counsel. The district court, pursuant to § 2254(d), deferred to the findings of fact made by the state courts. It agreed with the standard of materiality applied by the state appellate court (*see* Ruling on Petition for Writ of Habeas Corpus dated July 28, 1987, at 11 n. 2), and with that court's conclusion that Miller had "failed to prove that the outcome of the proceedings in the instant case would have been different if the prosecutor disclosed evidence relating to the Lupinacci case," *id.* at 9. Judgment was entered denying the writ, and this appeal followed.

For the reasons below, we conclude that the writ should have been granted on the basis of Miller's *Brady v. Maryland* claim.

We therefore need not reach the claim of ineffective assistance of counsel.

## II. DISCUSSION

In challenging the district court's rejection of his *Brady v. Maryland* claim, Miller argues that the court did not apply the correct test for evaluating the materiality of the withheld information. Both the district court and the state appellate court focused solely on whether Miller's attorney would have pursued a different strategy had he been given the Lupinacci information; and both found that Miller had not proved that the outcome of the proceedings "would" have been different if the Lupinacci information had been disclosed. Miller contends (1) that these courts applied an unduly burdensome test of materiality, and (2) that the courts should have focused not just on Bundock's likely recommendation following disclosure but also on whether Miller himself would likely have agreed to plead insanity. We agree with both contentions.

A. *The Applicability of* Brady v. Maryland *and Its Progeny to A Plea of Not Guilty By Reason of Insanity*

■ It is by now well established that a person accused of a crime has a due process right to require the prosecution to turn over to him any material exculpatory evidence in its possession. "The suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196. The applicability of this principle to proceedings in which the defendant has pleaded not guilty by reason of insanity, however, is far from well established. Indeed, we are unaware of any case prior to Miller's state court habeas proceeding in which this question has been explored. For the reasons below, we think the most analogous principles on which we may draw are those applicable to proceedings in which the accused has entered a plea of guilty.

■ When a defendant pleads guilty, he waives several federal constitutional rights, including the right to confront his accusers and the privilege against compulsory self-incrimination. *See Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969). A plea of not guilty by reason of insanity resembles the plea of guilty in several significant respects, as it waives important trial rights belonging to the defendant, including his right to argue that he did not perform the acts with which he is charged, his right to urge through cross-examination of the State's witnesses that his confessions were not voluntary, and his right to introduce any other evidence tending to create a doubt that he actually performed the acts charged. Thus, Bundock testified that "when you go on the insanity defense, you admit the crime, but deny that your client was capable of committing it because of mental infirmity" (State Habeas Hearing Transcript, December 16, 1982, at 150–51); "when you pursue that course, you're admitting that he did it" (*id.*, December 21, 1982, at 38). Similarly, Gormley testified that his agreement with Bundock was to "allow the State to put its case on as briefly as possible," and that there generally would be "no cross-examination or any contest with the facts presented by the State." (*Id.*, December 16, 1982, at 33.) Accordingly, the state habeas court observed that "[s]ince his client had elected the plea of not guilty by reason of insanity Mr. Bundock did not, of course, while on trial attempt to throw suspicion upon Mr. Lupinacci." (State Habeas Court Decision at 27.)

On the other hand, under Connecticut law, the plea of not guilty by reason of insanity differs from a plea of guilty in that the State still has an obligation to present a prima facie case sufficient to convince the triers of fact beyond a reasonable doubt that the defendant performed the acts alleged. *See State v. Warren*, 363 A.2d at 96. Nonetheless, it is plain that the insanity plea is more like a plea of guilty than it is like a plea of not guilty since, while not relieving the State of all burden to prove that the defendant per-

formed the acts charged, the insanity plea lessens that burden considerably as a practical matter by barring the defendant from contesting or impeaching the State's proof and from presenting other evidence that could counter that proof. Accordingly, we turn to principles pertaining to pleas of guilty.

■ In the absence of special circumstances, the validity of a plea of guilty is determined by reference to whether it was intelligent and voluntary. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709. As a general matter, a plea is deemed "intelligent" if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way; it is deemed "voluntary" if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally. *See Brady v. United States*, 397 U.S. at 750, 90 S.Ct. at 1470. The *Brady v. United States* Court made clear, however, that this test suffices only in the "absen[ce of] misrepresentation or other impermissible conduct by state agents." *Id.* at 757, 90 S.Ct. at 1473. Since a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case, *id.* at 756, 90 S.Ct. at 1473, and of information that may be available to cast doubt on the fact or degree of his culpability, we conclude that even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.

Given the practical similarities between guilty pleas and pleas of not guilty by reason of insanity, and the influence that exculpatory material may have on the accused's decision whether to plead insanity rather than not guilty, we conclude that the *Brady v. Maryland* principles are also applicable where the defendant has pleaded not guilty by reason of insanity.

**B.** *The Degree of Certainty Required To Establish* Brady v. Maryland *Materiality*

■ A person who claims that exculpatory information has been withheld from him by the prosecution in violation of his due process rights as explicated in *Brady v. Maryland* is entitled to relief only if the withheld information was "material." Evidence is "material" in this context " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, *J.*)); *see also United States v. Bagley*, 473 U.S. at 685, 105 S.Ct. at 3385 (opinion of White, *J.*). This concept of materiality applies whether the accused has made a precise request for the material that was withheld, or only a general request for any exculpatory material, or no request at all. *United States v. Bagley*, 473 U.S. at 682–83, 105 S.Ct. at 3384–85 (opinion of Blackmun, *J.*); *id.* at 685, 105 S.Ct. at 3385 (opinion of White, *J.*).

In *United States v. Agurs*, the Supreme Court ruled that evidence that "creates a reasonable doubt that did not otherwise exist" as to the defendant's guilt must be considered material. 427 U.S. at 112, 96 S.Ct. at 2401. But "[t]his formulation does not mean that the defendant must be able to show that the evidence *would 'probably* lead to an acquittal,' which is the standard that must be met for the granting of a new trial on the basis of newly discovered evidence from a source other than the government...." *United States v. Srulowitz*, 785 F.2d 382, 388 (2d Cir.1986) (emphasis added). Rather, as the Court has made clear, a "reasonable" probability suffices, and " '[a] "reasonable probability" is a probability sufficient to undermine confidence in the outcome' " of the case. *Pennsylvania v. Ritchie*, 107 S.Ct. at 1001 (quoting *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384 (opinion of Blackmun, *J.*, quoting *Strickland v. Washing-*

*ton,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984))).

 Neither the state courts nor the district court applied this standard. The state appellate court instead required Miller to show to a "reasonable certain[ty]" that disclosure would have produced a different outcome. The district court stated its agreement with the standard adopted by the state appellate court and rejected Miller's claim because he had failed to prove that the outcome of the proceedings "would have been different."

The courts' rationale for their use of the "reasonable certain[ty]" test was that Miller had not been found guilty but had been found not guilty. Their reasoning suggested that Miller was not disadvantaged by the State's pretrial withholding of evidence and/or that his confinement was unrelated to the events that preceded his trial. We disagree. In fact, Miller has been in custody since 1973, committed pursuant to a court order finding by a simple preponderance of the evidence that he was a danger to himself and others. The preponderance standard was applicable because Miller had successfully invoked the insanity defense. *See* Conn.Gen.Stat.Ann. § 53a–47 (repealed 1985). Had Miller pleaded not guilty and been acquitted, he would have had a due process right not to be committed involuntarily unless his dangerousness was established by clear and convincing evidence. *See Addington v. Texas,* 441 U.S. 418, 432–33, 99 S.Ct. 1804, 1812–13, 60 L.Ed.2d 323 (1979) ("[t]o meet due process demands ... the proof [supporting involuntary commitment] must be greater than the preponderance-of-the-evidence standard ..."); *see generally Warren v. Harvey,* 472 F.Supp. 1061, 1068–72 (D.Conn.1979), *aff'd,* 632 F.2d 925 (2d Cir.), *cert. denied,* 449 U.S. 902, 101 S.Ct. 273, 66 L.Ed.2d 133 (1980); *cf.* Conn.Gen.Stat.Ann. § 17–178(c) (West Supp.1988) (adopting "clear and convincing" standard). Further, once Miller was found not guilty only by reason of insanity, the subsidiary finding that he had committed the acts attributed to him would be considered as "substantial" evidence of his likely dangerousness in the future. *See*

*Warren v. Harvey,* 632 F.2d at 934. Since, in order for Miller to be found not guilty by reason of insanity, and hence subject to confinement under a mere preponderance standard, the State was required to prove beyond a reasonable doubt that he performed the acts attributed to him, Miller is entitled to challenge the State's withholding of evidence that would have cast doubt on that question and that could have affected his decision to plead insanity and waive his right to contest the State's proof.

We conclude that the standards of materiality established by *Brady, Agurs, Bagley,* and *Ritchie* are applicable to Miller's claim.

## C. *The Materiality of the Withheld Evidence*

There is no question in this case that the State withheld the results of its Lupinacci investigation from Miller and Bundock. Both state courts so found. Nor can there be any question that the information gathered was favorable to Miller, in that it suggested that the murders might have been committed by Lupinacci rather than Miller. Indeed, the state appellate court found that the Lupinacci materials were "clearly" and "obvious[ly]" exculpatory of Miller. Thus, the only issue in the present case is whether there is a reasonable probability that disclosure of those materials would have affected the outcome of the proceedings, *i.e.,* whether they are sufficient to shake one's confidence in the outcome of the Miller proceedings.

In seeking to state in somewhat more concrete terms this "reasonable probability" test of materiality as it would apply to the entry of an insanity plea after the prosecution has withheld exculpatory evidence, we note that the Supreme Court has considered the concept of materiality (or "prejudice" to the defendant) to be the same for claims of withheld evidence as for claims of ineffective assistance of counsel. *See, e.g., Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068 (test for "prejudice" stemming from error of counsel "finds its roots in the test for materiality of exculpatory information not disclosed

to the defense by the prosecution"); *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384 (opinion of Blackmun, *J.*, using the *"Strickland* formulation" in case involving withheld evidence); *Pennsylvania v. Ritchie*, 107 S.Ct. at 1001 (a withheld-evidence case adopting Justice Blackmun's *Bagley* formulation which included *Strickland* 's "sufficient to undermine confidence in the outcome" test). Accordingly, given the parallel standards and the similarities between a plea of guilty and a plea of not guilty by reason of insanity, we consider it useful in the present case to look to the Supreme Court's discussion of materiality in *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), which involved a claim that the defendant's decision to enter a plea of guilty was caused by the ineffective assistance of his counsel.

In *Hill v. Lockhart,* the Court's bottom-line test to determine whether flaws in the performance of counsel were material was stated as follows: "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59, 106 S.Ct. at 370. As an illustration, the Court indicated that the defendant might meet this test if error-free representation would likely have led counsel to recommend a plea of not guilty:

> For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Id.*

 In assessing the materiality of the withheld information in the present case, the state appellate court and the district court focused solely on whether disclosure of the Lupinacci information would have affected Bundock's recommendation

to Miller. The plea context, however, requires the broader focus manifested in *Hill* 's bottom-line formulation, for the right to decide whether to plead guilty, or not guilty, or not guilty by reason of insanity belongs to the defendant, not to counsel. Counsel indeed recommends, and if disclosure would likely have caused him to alter his recommendation, that likelihood will usually suffice to show materiality. But whatever counsel recommends, it is the accused who must decide. Thus, we conclude that even where counsel would likely adhere to his recommendation of a plea of guilty or not guilty by reason of insanity, if there is a reasonable probability that but for the withholding of the information the accused would not have entered the recommended plea but would have insisted on going to a full trial, the withheld information is material within the meaning of the *Brady v. Maryland* line of cases.

 In assessing the likelihood that either the recommendation of counsel or the decision by the accused would have been different if the prosecution had not withheld the exculpatory evidence, the test is an objective one, depending largely on the likely persuasiveness of the withheld information. We have detailed the evidence possessed by the State as to Lupinacci in some detail in Part I.C. above. The State's file included information that Lupinacci was a "sex nut" who patronized black prostitutes but despised blacks; that he had, at pertinent times spanning four years, frequented places where at least four of the five women Miller was charged with killing frequented or resided; that he had cruised the area from which Kahn disappeared on the night she was murdered; that Henry was last seen on the street of Lupinacci's club; that Thompson was last seen in a car resembling Lupinacci's and that a similar car had been seen near the murder site on that night; that Lupinacci's car had been seen near the murder sites several times; that negroid limb hairs were found in the trunk of Lupinacci's car; that a deck of pornographic playing cards found in Lupinacci's trunk was missing a card and that a similar card had been found near Thompson's body; and that Lupinacci knew nonpublic facts about the murders.

There is no doubt that the insanity plea, unlike a plea of not guilty, offered the possibility that Miller could escape having convictions on his record and perhaps even escape further confinement altogether if the state could not prove that he was currently a danger to himself or to others. But when the undisclosed facts possessed by the prosecution are added to the fact that Lupinacci was arrested in the act of attempting to strangle a black prostitute in the very area where the other victims had been found strangled, we conclude that the withheld information is sufficient to undermine confidence in the outcome of both Miller's decision to forgo any challenge to the State's assertion that he was the murderer and the decision of a rational factfinder as to whether the identity of Miller as the murderer was established beyond a reasonable doubt.

In sum, we conclude that the withheld information was material within the meaning of the *Brady v. Maryland* line of cases.

Three other facets of the prior rejections of Miller's *Brady* claim deserve mention. First, the state habeas court indicated that it could not conclude that the withheld information was sufficient to create a reasonable doubt because the State possessed additional evidence that it had forgone presenting in light of the insanity plea agreement. We believe the State is not entitled to seek to minimize the materiality of the withheld information by arguing that it could have produced additional evidence at a fuller trial. Having avoided the need to make a full presentation by means of a plea agreement that immunized its presentation from attack, and having achieved the plea agreement only after withholding information that would have put teeth in the attack, the State should not be allowed to becloud the court's already hypothetical analysis of the likely effect of the withheld information by adverting to other evidence it *might* have adduced had it not procured the plea agreement.

Second, both the state appellate court and the district court appear to have rested their rejection of Miller's *Brady v. Maryland* claim on a finding that Bundock's own recommendation would not have changed had he known the contents of the State's Lupinacci file. We are skeptical of the validity of such an individualized inquiry. The question whether there is a reasonable probability that counsel's recommendation would have been different had the information been disclosed is not a question of historical fact but rather a mixed question of fact and law resting on an objective evaluation as to the likely persuasiveness of the information. *See Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 2590, 91 L.Ed.2d 305 (1986); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052. Given the nature of the question and the clear directions in *Hill* and *Strickland* that the likely outcome of a trial should be assessed "objectively, without regard for the 'idiosyncracies of the particular decisionmaker,'" *Hill v. Lockhart*, 474 U.S. at 60–61, 106 S.Ct. at 371–72 (quoting *Strickland v. Washington*, 466 U.S. at 695, 104 S.Ct. at 2068), the habeas courts should have made an objective evaluation of the likely impact that the withheld information would have had on typically competent counsel, rather than make what appears to be a retrospective finding as to what the effect would actually have been on Bundock, who relied on his surely idiosyncratic view that the Lupinacci facts were "not relevant" because acts like the one in which Lupinacci was caught "happen[ ] every day on the Merritt Parkway" (State Habeas Hearing Transcript, December 16, 1982, at 140–41).

Finally, the state habeas court's doubt as to the admissibility of the Lupinacci information under state-law evidentiary principles was unwarranted. As the state appellate court ruled, the Lupinacci information was plainly relevant to the question of who committed the murders. Given a defendant's Sixth Amendment right to present evidence in his favor, *see Taylor v. Illinois*, —— U.S. ——, 108 S.Ct. 646, 652, 98 L.Ed.2d 798 (1988) ("'at a minimum, ... criminal defendants have ... the right to put before a jury evidence that might influence the determination of guilt'" (quoting *Pennsylvania v. Ritchie*, 107 S.Ct. at 1001)), and his Fifth Amendment right not to be deprived of his liberty

without due process, we have little doubt that the Lupinacci evidence would have been admissible. Connecticut law does not appear to be to the contrary, *see State v. Bryant,* 202 Conn. 676, 688, 523 A.2d 451, 458 (1987) (assuming relevance, "[i]t is always competent for a [defendant] to [present] evidence tending to show that another committed the crime [with] which he is charged") (brackets in original; quoting other Connecticut cases); and state law could not, in any event, diminish Miller's federal constitutional rights.

### CONCLUSION

For the reasons above, we conclude that Miller's claim under *Brady v. Maryland* has merit. Accordingly, we reverse the judgment of the district court dismissing Miller's petition and remand for entry of a judgment conditionally granting the writ. The judgment should provide that the writ will be granted unless within a reasonable time the State brings Miller to trial.