STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
NORWOOD L. WHITE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 22, 1988—Decided July 18, 1988.

Before Judges FURMAN and COHEN.

*Fredric J. Gross*, Designated Attorney, argued the cause for appellant (*Alfred A. Slocum*, Public Defender, attorney).

*Carol M. Henderson*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General, attorney).

The opinion of the court was delivered by

FURMAN, P.J.A.D.

Defendant appeals from the denial of his petition for post-conviction relief under *R.* 3:22. He had been convicted in 1976, following a jury trial, of rape, *N.J.S.A.* 2A:138–1; breaking and entering with intent to rape, rob or kill, *N.J.S.A.* 2A:94–1; threat to kill, *N.J.S.A.* 2A:113–8; robbery, *N.J.S.A.* 2A:141–1; and robbery while armed, *N.J.S.A.* 2A:151–5. His aggregate sentence was an indeterminate term with a 30 year maximum to Avenel, to be followed by a State Prison term of not less than 32 years nor more than 47 years.

The thrust of defendant's appeal is that the State prior to trial withheld exculpatory evidence material to his defense notwithstanding his demand for production of relevant evidence from the State's file, in violation of his constitutional due process rights as defined in *Brady v. Maryland*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963). That evidence would have been a blood test result on semen from another rape committed about a month earlier and about ten miles away, which would have tended to exculpate defendant of that rape. Neither defendant nor any other suspect was ever charged with the earlier rape. Defendant's theory is that the two rapes were "signature crimes" with virtual identical *modi operandi*, which must have been committed by the same person. *See State v. Garfole*, 76 *N.J.* 445 (1978). Defendant and his counsel were not informed by the State of the blood test result from the earlier rape until 1985.

Both rapes occurred in Hunterdon County, the first on October 17, 1974, a Thursday, starting about 1:30 A.M. in Fleming-

ton; the second on November 21, 1974, also a Thursday, starting about 2:30 a.m. in White House Station. The victim in the first was L.O.; acts of perversion were also committed involving her husband, and a family dog. The victim in the second was E.E., who was alone in her house except for her three sons.

The State's case was circumstantial but strong that defendant was guilty of the E.E. rape. Within about five minutes after the perpetrator left E.E.'s house, defendant's car was observed by a police officer about three tenths of a mile away, stopped partially in the roadway at the intersection of Routes 22 and 523 with its parking lights on and the driver's door open. At that time, the police officer had no information about the E.E. rape. He circled back, keeping the stopped car in sight. He then saw defendant walking in front of the car. Among other reasonably inferable possibilities, defendant had driven his car a short distance from somewhere nearer the E.E. home and then stopped his car to go outside to urinate.

The police officer smelled alcohol on defendant's breath, conforming to E.E.'s description of her assailant to another police officer a few minutes later. He observed a pair of brown gloves and a flashlight in the car and found several dollars in change on defendant's person and a knife in his pants' pocket; all four items conformed to E.E.'s later account of what her assailant was wearing, had with him and had taken from her. Two back-up police officers arrived. The police officers at the scene heard a dispatcher report of the nearby rape and robbery over the patrol car radio. One of the three police officers left to question E.E. During the rape, E.E.'s head had been covered with a paper bag; she did not see her assailant's face. Nevertheless, in numerous significant details in addition to the items already mentioned, E.E.'s physical description of her assailant, his clothing, what he had with him and what he had taken from her matched what the police officers observed and found at the scene of the motor vehicle stop. Defendant was about 5'9" tall, of a heavy build and with a "wide" mustache. He was wearing dark pants and a waist-length jacket. His

pants had a belt buckle. E.E. reported that two twenty dollar bills folded in half twice were taken from her. Two twenty dollar bills folded in half twice were found in defendant's wallet.

In addition, there were semen spills on defendant's pants near the fly and on his T-shirt. His penis was uncircumcised, as E.E. had reported of her assailant. Soil samples on his shoes matched the soil outside E.E.'s house, according to microscope visual examination. Animal hairs on his clothing were consistent with E.E.'s dog's. E.E. later stated that defendant's jacket and belt buckle felt like the jacket and belt buckle she had touched during her rape.

Even prior to the E.E. rape, defendant had been a suspect in the rape a month earlier. He had two prior convictions of rape. He had moved recently within 100 yards of L.O.'s house. Later in the same day as the E.E. rape, the Flemington police obtained a search warrant to search defendant's house for evidence connecting him with the earlier rape. The supporting affidavit referred to the similarity of the two crimes. The Flemington police search produced nothing tending to incriminate defendant of the earlier rape.

Subsequent blood tests on the semen samples from both rapes were inconsistent and inconclusive. Defendant had Type A blood and was a non-secretor whose blood type was not identifiable from body fluids. He was not ruled out as the perpetrator of the E.E. rape. The semen samples from L.O.'s panties showed Type O blood from a secretor. But the semen may have been from the perpetrator, from the husband, who had Type A blood, from the dog, or from some contaminated combination of the three, according to the victims' account of the rape and accompanying perversions.

At the trial in 1976, defendant's attorney objected to the State's introduction under *Evid.R.* 55 of any evidence bearing on the earlier rape. Defendant and his attorney were then unaware of the blood test result in 1975 on the semen samples from the L.O. rape. That result was not communicated to

defendant or his attorney until 1985, as we noted *supra*, during the pendency of a *habeas corpus* proceeding brought by defendant in the federal courts.[1]

There were numerous parallels between the L.O. and E.E. rapes suggesting "signature crimes," but numerous differences as well. Among the parallels were the propinquity in time and geographical area and, as described by the victims, the height and build of the perpetrator; his uncircumcised penis; his speaking in broken English; his carrying a flashlight; his directing the victims not to look at him; his covering the victims' heads, with a paper bag in the E.E. rape and with pillowcases in the earlier rape; his jabbing at the victims with a knife; his committing a robbery; his wearing gloves, a waist-length jacket and a belt buckle.

On the other hand, the L.O. criminal episode lasted an hour and a half, the E.E. criminal episode only about a half hour; the L.O. episode was more deviant and, apart from the rape itself, more sadistic, involving an element of voyeurism; the victims were compelled to perform unnatural sex acts on each other and on the family dog; the family dog at E.E.'s house was untouched; the perpetrator of the L.O. rape was clean shaven; the perpetrator of the E.E. rape only a month later had a "wide" mustache; the perpetrator of the L.O. rape cut the telephone wires and tied the victims' hands behind their backs; the perpetrator of the E.E. rape did neither; the smell of alcohol was reported only by E.E.; the perpetrator of the L.O. rape spoke in broken English throughout; the perpetrator of the E.E. rape reverted to normal English towards the end of the episode.

On this appeal, defendant cites no decisional law authority that evidence tending to exculpate a defendant of a crime with which he is not charged may be wrongfully nondisclosed evidence as defined in *Brady*.

---

[1]The *habeas corpus* procceding was dismissed in the Federal District Court later in 1985, with a finding of no probable cause for appeal.

We assume that the *Brady* rule should be applied to evidence exculpating a defendant of another crime, which might be admitted defensively under *Garfole,* notwithstanding *Evid.R.* 4, to negate his guilt of the crime under prosecution. That applicability should be limited to circumstances, as here, where the prosecuting authorities have concluded, at least tentatively, that, because of their relative propinquity in time and place and substantially identical *modi operandi,* one person must have committed both crimes, and, prior to the discovery of the nondisclosed evidence, the prime suspect was the defendant under prosecution.

According to *Brady,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196–97:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

We must weigh whether, under the standard of materiality of *Brady* and decisional law following *Brady,* the prosecution's failure to disclose the blood test result on semen samples from the L.O. rape infringed defendant's constitutionally protected due process rights. That standard has been defined as whether, if the evidence was timely made available to the defense, there is a reasonable probability that the result at trial would have been different or that a reasonable doubt would have been created where one did not otherwise exist. *Pennsylvania v. Ritchie,* 480 *U.S.* 39, 107 *S.Ct.* 989, 1001, 94 *L.Ed.*2d 40 (1987); *Miller v. Angliker,* 848 *F.*2d 1312, 1320 (2d Cir.1988). By that standard, we conclude that the withholding of the L.O. blood test result was not an unconstitutional deprivation of defendant's right to a fair trial.

Three factors undergird our conclusion. Predominantly, the evidence of defendant's guilt of the E.E. rape was so overwhelming as to minimize any contingency of an acquittal, even with the L.O. blood test result before the jury. In addition, there is an appreciable possibility that, on the evidence, the jury would have found the L.O. blood test ambiguous and inconclusive. Finally, if there had been a mini-trial of the L.O. rape, a

trial within a trial, as would have been necessary for defendant to prove a "signature crime," a jury determination that the same individual committed both crimes is at least doubtful, in view of the numerous factual differences between the L.O. and E.E. rapes.

To sum up, we cannot conclude that the nondisclosed blood test evidence would have raised a reasonable doubt which did not otherwise exist, in view of the strength of the State's proof of defendant's guilt of the E.E. rape. We cannot conclude that if the L.O. blood test result had been timely made available to the defense, a different jury outcome would have been reasonably probable, that is, that, within reasonable probability, the jury would have determined that the same individual committed both the L.O. and E.E. rapes, that the blood test result conclusively proved defendant's innocence of the L.O. rape and that defendant, thus, must be innocent of the E.E. rape.

We affirm.