UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 94-1008

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 FRANCISCO RODRIGUEZ CLAUDIO,
 a/k/a PITO,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Raymond L. Acosta, U.S. District Judge] 

 

 Before

 Selya, Boudin and Stahl,

 Circuit Judges. 

 

James Kousouros for appellant. 
Richard A. Friedman, Department of Justice, with whom Guillermo 
Gil, United States Attorney, and Rosa E. Rodriguez-Velez, Assistant 
United States Attorney, were on brief for the United States.

 

 January 5, 1995
 

 BOUDIN, Circuit Judge. On May 6, 1992, Francisco 

Rodriguez Claudio was indicted, in the last superseding

indictment in this case, for conspiring to import heroin, 21

U.S.C. 952(a), 963, and for conspiring to possess it with

intent to distribute. 21 U.S.C. 841(a), 846. The

indictment, which embraced 23 co-defendants, charged

Rodriguez and others with participating in a wide-ranging

drug conspiracy to secure heroin from Southeast Asia and

distribute it in Puerto Rico and elsewhere in the United

States. Various defendants, including Rodriguez, were

charged with specific acts of possession, transportation and

money laundering.

 At the time Rodriguez was indicted in the present case,

he was serving a sentence of 105 months as a result of an

earlier guilty plea entered in October 1990. In this earlier

case, Rodriguez had pled guilty to one count of conspiring to

possess heroin with intent to distribute and one count of

aiding and abetting an attempt to possess heroin with intent

to distribute. 21 U.S.C. 841(a), 846. That case centered

around a specific reverse-sting drug transaction in Puerto

Rico involving Rodriguez.

 Following his indictment in May 1992, Rodriguez moved to

dismiss on the ground that the new prosecution was barred

under the double jeopardy clause, U.S. Const., amend. V. The

government responded with an opposition including a number of

 -2- -2-

exhibits, three of which were filed ex parte with a request 

that they be sealed. Defense counsel was advised of the

nature of these sealed documents but not their contents. The

sealed documents were two DEA-6 forms recording witness

interviews and one transcript containing grand jury testimony

of a co-conspirator.

 The magistrate judge, to whom the double jeopardy motion

was referred, rejected Rodriguez' attempt to secure the

sealed materials. Ultimately the magistrate judge filed a

report recommending that the double jeopardy claim be

disallowed. On review, the district court rejected the

double jeopardy defense and upheld the sealing of the three

documents. Neither the magistrate judge nor the district

court held an evidentiary hearing.

 Rodriguez then entered into a conditional plea agreement

reserving his right to appeal the rejection of the double

jeopardy defense. Fed. R. Crim. P. 11(a)(2). On March 22,

1993, Rodriguez pled guilty to the drug importation

conspiracy charge already mentioned and to two substantive

counts: one for money laundering, 18 U.S.C. 1956(a)(2)(A),

and the other for a specific act of importation. 21 U.S.C. 

952(a). The remaining charges against Rodriguez, including

the distribution conspiracy count under 21 U.S.C. 841(a),

846, were dismissed.

 -3- -3-

 The district court sentenced Rodriguez to concurrent

sentences of 112 months on all three counts, these sentences

to run concurrently with the previously imposed (and partly

served) 105-month sentence in the earlier case that had ended

with the guilty plea entered in May 1990. The district

court's object was to produce a total punishment of 142

months' imprisonment for the two cases pursuant to guideline

provisions discussed below. The district court declined to

grant a downward departure or to defer sentencing in order to

hear medical experts testify about the condition of

Rodriguez' son.

 On this appeal, Rodriguez assails the denial of his

double jeopardy claim and the sealing of the three documents.

He then argues that the sealed items also constituted Brady 

material and were independently required to be disclosed.

Finally, Rodriguez says that the district court should have

allowed the medical experts to testify in support of the

downward departure request and that in any event the sentence

was improperly calculated. We address the issues in that

order.

 1. The double jeopardy issue is more complicated than

difficult. On appeal, Rodriguez has narrowed the double

jeopardy claim to an attack on the import conspiracy count in

the May 1992 indictment. In substance he claims that the

distribution conspiracy charged in the earlier 1990 case was

 -4- -4-

merely an aspect of the larger import conspiracy charged in

the present case. Having been prosecuted and convicted of

that "single" offense--Rodriguez argues--he cannot now be

prosecuted a second time for the same offense. See North 

Carolina v. Pearce, 395 U.S. 711 (1969).  

 The government has, of course, brought the two

conspiracy charges under different statutes. The October

1990 plea in the prior case concerned a conspiracy to possess

with intent to distribute and the March 1993 plea in this

case involved a conspiracy to import. The former charge (but

not the latter) requires an intent to distribute as an

element of the offense; and the latter (but not the former)

requires an intent to import. Thus, the test for separate

offenses adopted in Blockburger v. United States, 284 U.S. 

299, 304 (1932), is satisfied. Put differently, an agreement

to import may be punished separately from an agreement to

possess with intent to distribute.

 In its brief, the government appears to assume that the

presence and applicability of two different conspiracy

statutes, each requiring an element that the other does not,

means that there were two different conspiratorial

agreements. That is not necessarily so. There could be only

a single agreement which had multiple criminal objectives

(e.g., a conspiracy to import and distribute heroin). See 

Braverman v. United States, 317 U.S. 49 (1942). As best we 

 -5- -5-

can tell, that is just what Rodriguez is arguing in this

case.

 But even if Rodriguez is right in claiming that there

was only a single agreement (and the indications are

otherwise), it does not matter. A single act may constitute 

two different offenses for double jeopardy purposes so long

as two different statutes were violated and each requires an

element that the other does not. This is true of conspiracy,

Albernaz v. United States, 450 U.S. 333 (1981) (single 

conspiracy embracing drug importation and distribution), as

well as other crimes. E.g., United States v. Franchi- 

Forlando, 838 F.2d 585, 589 (1st Cir. 1988) (importation of 

drugs violating both prior approval and disclosure statutes).

 This case involves not only multiple convictions but

successive prosecutions, yet the Blockburger test is 

generally applied in both situations. See United States v. 

Dixon, 113 S. Ct. 2849, 2859-64 (1993). Perhaps in some 

circumstances there might be collateral estoppel or even due

process limitations on a second prosecution for the same act

(e.g., where an acquittal occurred in the first case). No 

such situation is presented here. And under the principles

established in Blockburger even a single conspiracy can be 

two different "offenses" for double jeopardy purposes.

Albernaz, 450 U.S. at 339. 

 -6- -6-

 Thus, we do not need to consider whether the overlap

between the two conspiracies here charged--in time, place,

conspirators, objects and the like--is such that there is one

unlawful agreement or several. See United States v. Gomez- 

Pabon, 911 F.2d 947 (1st Cir. 1989), cert. denied, 493 U.S. 

1030 (1990). In fact, the government has a colorable case

that the distribution conspiracy charged in the 1990

indictment was a narrow one and that, apart from the common

presence of Rodriguez and one confederate, that drug deal had

little to do with the large ring responsible for the

Southeast Asia imports. But the evidence is mixed, no

evidentiary hearing was ever held, and it is unnecessary to

resolve the matter.

 For the same reason, the sealing of two witness

interviews and the grand jury transcript cannot be

prejudicial in relation to the double jeopardy defense. The

only relevance of the material (so far as double jeopardy is

concerned) was its bearing on the question whether there was

one conspiracy or several, and the answer does not matter.

In fairness to the parties, we note that this case was

largely litigated in the district court before United States 

v. Dixon, overruled the "same conduct" test of Grady v. 

Corbin, 495 U.S. 508 (1990), and under Grady the double 

jeopardy and any related disclosure claims might look

different. 

 -7- -7-

 2. Looking to future prosecutions, we think it useful

to comment on one aspect of the sealing issue and the

government's defense of the procedure it followed. It is

true that from time to time, in special circumstances, judges

in criminal cases do receive submissions from prosecutors

whose contents are not made known to the defense; and in

extraordinarily rare cases even the existence of the

submission may be undisclosed. United States v. Innamorati, 

996 F.2d 456, 487 (1st Cir.), cert. denied, 114 S. Ct. 409, 

459 (1993), 114 S. Ct. 1072, 1073 (1994). But our traditions

make both of these courses presumptively doubtful, and the

burden of justification is upon the government.

 In this case it is difficult to tell from the materials

available to us what justification was provided by the

government at the outset; we have only a boilerplate motion

to seal which was granted. Thereafter, when the defense

sought access to the material, the government's response to

the magistrate judge and to the district court was that the

witness statements were Jencks materials which need not be 

disclosed before the witness testifies, see 18 U.S.C. 3500; 

Fed. R. Crim. P. 26.2, and that grand jury materials were

protected by Fed. R. Crim. P. 6. The government renews its

contention in this court.

 The contention is so fundamentally mistaken that we

cannot pass by it in silence for fear that the government may

 -8- -8-

think to repeat its approach in a case where it turns out to

matter. Subject to various qualifications, the Jencks Act

and Rule 6 are perfectly proper objections when the defense

is fishing on discovery to obtain information from the

government. But this is an instance in which the government

was seeking affirmatively to use the sealed information in

court as evidence, to obtain a ruling from the magistrate

judge and the district court on the merits of the double

jeopardy issue. 

 Rodriguez' position on appeal--that the government can

never affirmatively use information in court and withhold it 

from the defense--may overstate the matter; but not by much.

To be sure, sealed submissions sometimes have to occur in

situations where the government seeks a ruling that certain

information it is withholding should not be disclosed

because, for example, it is claimed to be irrelevant or

privileged or outside the scope of Brady v. Maryland, 373 

U.S. 83 (1963). Even then, the courts customarily insist on

a particularized showing of substantial cause (e.g., state 

secret, danger to an ongoing investigation). See Innamorati, 

996 F.2d at 487 (citing cases).

 The notion that the government can have a defendant's

defense dismissed based on government evidence that the

defendant is not allowed to see goes even further than the

withholding of irrelevant or privileged information. And the

 -9- -9-

government's asserted reasons here do not even begin to

approach a justification for such an action. Jencks material 

is disclosed routinely after a witness testifies; and grand

jury testimony can be made available under Rule 6 based on

all kinds of circumstances. The idea that general safeguards

against wide-ranging discovery like the Jencks Act and Rule 6

would be sufficient to justify a conviction on secret

evidence is patently absurd.

 The government cites us to the alleged "flat preclusion"

of the Jencks Act, which states that no report by a

government witness or prospective witness in a criminal case

"shall be the subject of subpena, discovery or inspection"

until the witness has testified on direct at trial. 18

U.S.C. 3500. But even the barest consideration of this

statute makes it apparent that it is a shield against

premature discovery efforts. See Jencks v. United States, 

353 U.S. 657 (1957). It is not a license for the government

to use such statements as evidence in court and then deny the 

defense access to them.

 Of course, a particular piece of evidence contained in a

Jencks statement or in grand jury testimony might itself be 

protected on independent grounds that are far more

compelling. But we need not try to imagine in this case what

grounds might be so compelling as to allow the government to

use evidence in court but withhold it from the defense.

 -10- -10-

Nothing in the government's brief so much as hints that it

has any justifications beyond its boilerplate Jencks Act and

Rule 6 assertions.

 3. We turn now to Rodriguez' claim of a Brady 

violation. Rodriguez now has access to one of the documents

previously sealed--a DEA debriefing of co-defendant Martinez

on April 6, 1992--which contains Martinez' assertion that

Rodriguez provided $150,000 for the purchase of cocaine in

Hong Kong. Although the date of the money transfer is not

stated, surrounding dates indicate that it occurred sometime

during March 1990 and at least some days before April 4,

1990, when Martinez traveled to Hong Kong to purchase drugs.

One of the overt acts charged against Rodriguez in aid of the

import conspiracy count was that on or about March 1990, he

provided $150,000 to Martinez in Puerto Rico to finance drug

purchases for import.

 In connection with the plea agreement and its Rule 11

proffer, the government twice asserted that the $150,000

transfer by Rodriguez occurred on April 7, 1990. On appeal,

Rodriguez asserts that the debriefing report, as well as

other government evidence, confirm that Martinez left for

Hong Kong on April 4. Since such evidence contradicted the

government's plea-related assertions that the money transfer

occurred in Puerto Rico on April 7, it had to be turned over

under the Brady doctrine. 

 -11- -11-

 The government assumes arguendo that Brady might apply 

where a withholding of exculpatory information actually

causes a guilty plea, see Miller v. Angliker, 848 F.2d 1312 

(2d Cir.) cert. denied, 488 U.S. 890 (1988), but says that it 

has no record that the defense ever requested Brady material 

in the district court. Rodriguez says that the failure to

make such a request is not conclusive. See Ouimette v. 

Moran, 942 F.2d 1, 9 n. 6 (1st Cir. 1991). We see no reason 

to explore these interesting subjects since, as the

government also points out, the discrepancy here has no

significance. 

 The government specified in the indictment that

Rodriguez transferred the $150,000 in or about March 1990;

that this date was correct is strongly suggested by the

Martinez' debriefing and is not contradicted by any evidence

we have seen. The government cannot explain how the April 7

date crept into the proceedings, but it was apparently an

error and would have been so explained in the district court,

had Rodriguez complained about the discrepancy between the

indictment and the proffer. So explained, the discrepancy

would not have given Rodriguez any reason to alter his plea.

 Tersely, Rodriguez' brief asserts that the April 6,

1992, report debriefing Martinez was Brady material for a 

quite different reason. In the report, Martinez is reported

 -12- -12-

(by the debriefing agent) as describing a proposed per-unit

purchase price for the drugs in an amount that Rodriguez now

says is implausible. The government, responding quite

briefly, says that the accuracy of the information was

"completely immaterial" to the counts of conviction and to

Rodriguez' decision to plead guilty.

 The misstatement as to the purchase price, if it were a

misstatement, might conceivably have furnished some

ammunition for cross-examination if Martinez had testified.

But there is no reason to think that the government

deliberately withheld information: it was apparently never

asked to search for Brady material and in any case the 

significance of the drug price figures certainly does not

leap off the page. More important, we have been given no

reason to think that even some impairment of Martinez'

credibility would have undermined what was apparently a

substantial case against Rodriguez.

 Rodriguez' brief makes no effort to explain why we

should think that one piece of potential cross-examination

evidence should be deemed likely to undermine the

government's case and Rodriguez' inclination to plead. At

the very least, Rodriguez' belated Brady objection requires 

some reason to believe that the plea would not have been

entered if the price information had been disclosed. Miller, 

848 F.2d at 1321-22. We need not be precise about the

 -13- -13-

required showing since no such showing is even attempted on

appeal.

 4. Rodriguez' remaining claims relate to his sentence.

The first one, which can be disposed of quite simply, is that

the district court abused its discretion in refusing to

postpone the scheduled sentencing, in order to allow the

submission of live medical testimony. Prior to the

sentencing Rodriguez had requested a downward departure

because of family circumstances, specifically, the need for

him to care for a 12 year old son suffering from a

neurological condition and a learning disorder. Rodriguez

had already submitted some written information about the

son's condition, but sought a postponement to offer live

medical testimony claimed to be more specific.

 The district court rejected the requested postponement,

explaining at the sentencing that the court had already

carefully considered the requested downward departure and

found it not to be warranted. But the court then offered to

accept at the hearing a proffer of what the absent expert's

medical testimony would be. A proffer was made, but it did

not alter the court's refusal to depart downward. On appeal,

Rodriguez does not claim that the district court

misunderstood the scope of its authority to depart--only that

the refusal to hear live testimony was an abuse of

discretion.

 -14- -14-

 The government tells us that we have no authority to

review the refusal to postpone because a refusal to depart is

itself largely unreviewable, and that in any case it would

have been impermissible to grant a downward departure. A

shorter, less debatable, answer is that there is no automatic

right to present live testimony at sentencing, United States 

v. Tardiff, 969 F.2d 1283, 1286 (1st Cir. 1992), and that 

testing the value of proposed live testimony by a proffer--

especially where a postponement would be involved--accords

with both common practice and good sense. Nothing in

Rodriguez' brief persuades us that a proffer was an

inadequate wayto convey thesubstance of themedical testimony.

 5. The remaining sentencing issue is more complicated.

Because Rodriguez was already serving a federal sentence for

drug offenses, he was sentenced in this case under U.S.S.G. 

5G1.3(c). Under this provision, the court calculates the

total punishment that would have been imposed if Rodriguez

had been convicted of both the prior offenses and the present

ones in one case, and then imposes a new sentence that runs

consecutively to the old to the extent needed to impose that

total punishment on Rodriguez. Id. comment. (n.3). In this 

case, the district court fixed the total punishment for the

prior and present crimes as 142 months, a figure that is not

here disputed.

 -15- -15-

 Since Rodriguez was already serving a 105 month

sentence, the district court then computed the new sentence

with the object of achieving a total period of 142 months'

imprisonment. Stating that Rodriguez had been incarcerated

for 30 months under the old sentence, the court fixed his new

sentence at 112 months' imprisonment and imposed it

concurrently with the prior 105 month sentence; obviously,

the original 30 months and the new 112 months would equal the

target of 142 months. On appeal, Rodriguez says for the

first time that, at the time of sentencing, he had already

served 37 rather than 30 months.

 The problem appears to arise because--unknown to the

district court--Rodriguez may have been credited on the

earlier sentence for seven months served while under arrest

and before conviction. 18 U.S.C. 3585(b). On appeal, the 

government says that the district court's 30-month premise

may have been mistaken but that the government is not certain

of the facts. The government also argues that the error has

been waived by Rodriguez' failure to raise the point in the

district court. It adds that Rodriguez can arguably obtain a

correction, if his version of the facts is borne out, under

Fed. R. Crim. P. 36.

 Rule 36 permits the district court to correct at any

time "[c]lerical mistakes in judgments . . . arising from

oversight or omission." The government agrees that the

 -16- -16-

judgment and transcript show that the district court did

intend to fix the present sentence by subtracting time

already served by Rodriguez on his prior sentence from the

target figure of 142 months. The question whether at the

time of sentencing in this case Rodriguez had served 30 or 37

months of his original sentence can probably be answered by

resort to Bureau of Prison records. Under these

circumstances, we see no reason why Rule 36 should not be

available as a remedy. United States v. Crecelius, 751 F. 

Supp. 1035, 1037 (D.R.I. 1990), aff'd, 946 F.2d 880 (1st Cir. 

1991) (table).

 It is also the more appropriate avenue for relief.

Technically, Rodriguez did waive his right to appeal on this

issue by failing to raise it below, United States v. Elwell, 

984 F.2d 1289, 1298 (1st Cir.), cert. denied, 113 S. Ct. 2429 

(1993). Rodriguez does not suggest that plain error

occurred; probably the 30-month figure was plausibly based on

the date of Rodriguez' original conviction. Even now

Rodriguez has not proved that there was in fact error. Under 

these circumstances, we agree with the government that the

proper remedy is to affirm without prejudice to Rodriguez'

filing of a Rule 36 motion supported by some documentation of

the 37 month figure.

 Affirmed. 

 -17- -17-